COMTEL CORPORATION, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 225–63—255–63, 314–63. Filed December 23, 1965.

---

[1] The following cases are consolidated herewith: Tri-Continental Financial Corporation, Transferee, docket No. 226–63; S. Stewart Alcorn, Jr., Transferee, docket No. 227–63; D. Frederick Barton, Transferee, docket No. 228–63; Dwight C. Baum, Transferee, docket No. 229–63; H. Lawrence Bogert, Jr., Transferee, docket No. 230–63; Willard S. Boothby, Jr., Transferee, docket No. 231–63; James B. Cullum, Jr., Transferee, docket No. 232–63; Disque D. Deane, Transferee, docket No. 233–63; Norman S. Downey, Transferee, docket No. 234–63; John Ellis, Transferee, docket No. 235–63; Basil B. Elmer, Transferee, docket No. 236–63; Elbert J. Evans, Transferee, docket No. 237–63; Lloyd S. Gilmour, Transferee, docket No. 238–63; Edward T. Herndon, Transferee, docket No. 239–63; Kenneth E. Hill, Transferee, docket No. 240–63; Edward S. Hope, Transferee, docket No. 241–63; Estate of H. Lawrence Jones, Deceased, Transferee, Edward K. Hessberg, Executor, docket No. 242–63; Joseph H. King, Transferee, docket No. 243–63; Charles V. Leroy, Transferee, docket No. 244–63; Donald S. MacFadden, Transferee, docket No. 245–63; John W. Mackey, Transferee, docket No. 246–63; William G. McKnight, Jr., Transferee, docket No. 247–63; John F. Power, Transferee, docket No. 248–63; Willis L. Roberts, Transferee, docket No. 249–63; James A. Sandbach, Transferee, docket No. 250–63; John W. Sharbough, Transferee, docket No. 251–63; S. Logan Stirling, Transferee, docket No. 252–63; Robert P. Walker, Transferee, docket No. 253–63; Milton J. Yoeckel, Transferee, docket No. 254–63; Harold H. Young, Transferee, docket No. 255–63; and Zeckendorf Hotels Corporation, docket No. 314–63.

*George G. Tyler* and *David G. Ormsby*, for the petitioners in all docket numbers, except docket No. 314–63.

*Jesse G. Silverman*, for the petitioner in docket No. 314–63.

*Leo A. Burgoyne*, for the respondent.

Pierce, *Judge:* This proceeding involves 32 separate but related cases, which were consolidated for trial before this Court. In the first of these (Comtel Corp., docket No. 225–63), the respondent determined a deficiency of $215,621.33 in the income tax of petitioner Comtel, a dissolved corporation, for its fractional taxable year covering the period from February 1, 1958, to September 30, 1958. In each of the other 31 consolidated cases, the respondent determined that the particular petitioner is liable as a transferee of assets of said Comtel Corp., for all or part of the above-mentioned deficiency, together with interest thereon.

All parties have now agreed, in substance: That the petitioners in the 31 last-mentioned transferee cases will abide the result of the Comtel case (docket No. 225–63); and that if it is decided in said principal case that there is a deficiency in the income tax of Comtel for the fractional taxable year involved, then—

As regards petitioner Tri-Continental Financial Corporation (Docket No. 226–63) and petitioner Zeckendorf Hotels Corporation (Docket No. 314–63), each of these is liable as a transferee of assets of Comtel Corporation for payment of the *full amount* of such deficiency plus interest as provided by law;

And as regards the respective petitioners in all the other transferee cases (Docket Nos. 227–63 through 255–63), each of these is liable as a transferee of assets of Comtel Corporation for payment of such deficiency *to the extent indicated* in the notice of transferee liability issued to the particular petitioner, plus interest as provided by law.

### Issue and Underlying Questions Presented

The basic issue to be here decided is whether petitioner Comtel Corp. is entitled to exclude from its taxable income, under the non-recognition of gain or loss provisions of section 337(a) of the 1954

Code, an undisputed gain or profit of $872,028.79 which it realized from certain transactions with Zeckendorf Hotels Corp., during the approximately 7-month period of its only active corporate existence. Decision of this issue will depend on the answer to one or both of the following questions:

(1) What was the true legal nature of said transactions with the Zeckendorf Corp. from which Comtel realized the large gain or profit here involved?

Stated more specifically: Did said transactions constitute: A *purchase* by Comtel from Zeckendorf of most of the shares of a third corporation's capital stock which Zeckendorf had been engaged in acquiring for its own purposes; and then, a very profitable *resale* of these same shares back to Zeckendorf about 7 months later, immediately following Comtel's adoption of a plan of complete liquidation? (Under such analysis of the transactions, the large profit involved might qualify for nonrecognition under section 337(a), as being a gain from sale of property by a liquidating corporation.)

*Or on the other hand*, did said transactions constitute (in substance and reality, as distinguished from their form) merely steps in a previously planned financing arrangement for the benefit of the Zeckendorf Corp.: (a) Under which certain New York financial organizations arranged for more than $8 million in cash to be made available to Zeckendorf for its use in meeting an existing legal commitment to purchase the above-mentioned shares of the third corporation's stock; (b) under which the Comtel Corp., was newly created to perform certain functions pertaining to said financing arrangement, including the assembling and delivery to Zeckendorf of the loan funds, and the holding of said third corporation's shares as collateral security; and (c) under which Zeckendorf, within a few months thereafter recovered possession of said collateral by paying Comtel not only the entire principal of the loan, but also additional previously agreed sums which respondent contends were in the nature of interest on the money loaned and compensation for financial services rendered? (Under this analysis of the transactions, the large undisputed profit represented by such additional sums would be ordinary income, as to which the nonrecognition provisions of section 337(a) would have no application.)

(2) In the alternative: Was Comtel a "collapsible corporation," as defined in section 341(b) of the 1954 Code, so that all the gain or profit here involved is taxable at ordinary income tax rates, free from any application of the nonrecognition provisions of section 337(a)?

### FINDINGS OF FACT

Most of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by refer-

ence; subject however to an understanding between the parties to the effect that descriptive words used in said stipulation, such as "purchase," "sale," "option," and other words of that general class, are not to be deemed conclusive as to the true character of the transactions to which they relate.

Petitioner Comtel Corp. (hereinafter called Comtel) is a New York corporation which was organized on February 4, 1958. About 7 months later on September 4, 1958, it adopted a plan of complete liquidation, authorizing the dissolution of the corporation and a prorata distribution of its assets to its stockholders on or before December 31, 1958—all of which was given effect. On October 23, 1958, a certificate of its dissolution was duly filed with the secretary of state of the State of New York. However, under New York law, Comtel's existence is continued for the purpose of prosecuting suits and of settling and winding up its affairs. Its Federal income tax return for its fractional taxable year ended September 30, 1958 (which is the taxable period here involved, and also the only period of its active existence), was filed with the district director of internal revenue for the Upper Manhattan District of New York.

The circumstances under which Comtel was created, and the facts regarding its realization of the undisputed gain or profit of approximately $872,000 here involved, are as follows.

*Facts re Zeckendorf Corporation's Initial Steps To Purchase All Shares of Commodore Hotel Stock*

In the fall of 1957 and for some years prior thereto, a New York corporation named Commodore Hotel, Inc., operated the Hotel Commodore in the city of New York, under a lease from a subsidiary of the New York Central Railroad Co. This operation was attractive from an investor's viewpoint. The hotel was well located. The remaining term of the lease extended to December 31, 1967. The lessee corporation's gross operating revenues for the calendar year 1957 approximated $4 million; and its net income after taxes was approximately $700,000. Also its assets as of December 31, 1957, included in addition to its lease and physical properties, cash of approximately $855,000, and investments in marketable securities which had a value of approximately $3 million. The lessee corporation's own outstanding shares of capital stock were publicly held, and were listed and traded on the American Stock Exchange.

On October 9, 1957, Zeckendorf Hotels Corp. (then named 9113 Corp., and hereinafter called Zeckendorf), was an operator of various hotels; and also, it was a wholly owned subsidiary of Webb & Knapp, Inc. As of said date, it (Zeckendorf) undertook to acquire all the issued and outstanding shares of stock of said Commodore Hotel, Inc.

(then consisting of about 483,132 shares of common stock), by making a written offer to all the stockholders to purchase their shares at the price of $18 per share, subject to certain specified conditions. Principal among these conditions were: (1) That the purchase offer would remain open through January 7, 1958, subject however to a right reserved by Zeckendorf to extend such period by not more than 30 days—in which event the purchase price per share would be increased in accordance with a specified formula; (2) that Zeckendorf would not be obligated to purchase any Commodore shares unless at least 322,089 shares were tendered for sale in accordance with the offer; and (3) that in any event, all shares tendered for sale would have to be deposited, against payment of the offered purchase price, with a designated bank which would act as depositary agent. The offer further stated that, within 3 days after said date of January 7, 1958 (or any extended date for depositing Commodore shares), Zeckendorf would transmit to the depositary agent for remittal to the tendering shareholders, the price of all shares purchased. Also, Webb & Knapp guaranteed to the Commodore shareholders all payments required of Zeckendorf under its said purchase offer. One of the officers of Webb & Knapp, and a moving force behind that company, was William Zeckendorf who was exceptionally well informed regarding the money markets.

During late 1957 and January 1958, Zeckendorf attempted to borrow, from a variety of sources, funds with which to pay for the Commodore shares that were being tendered pursuant to its purchase offer—because it did not have sufficient cash of its own on hand for such purpose. These initial attempts to arrange a loan were unsuccessful. On January 7, 1958, Zeckendorf extended the period of its purchase offer to February 6, 1958—which extension had the effect, under the terms of its initial offer, of increasing the purchase price for all shares to about $18.10 per share. At this time, Zeckendorf "urged" all Commodore stockholders who had not already done so to deposit their shares with the depositary agent, for purchase.

On February 6, 1958, which was the final extended date on which Commodore stockholders were entitled to tender their shares, the number of shares which had then been deposited with the depositary agent totaled about 442,972 shares—representing approximately 91.68 percent of all Commodore shares outstanding. This exceeded the minimum number of shares required under the offer of purchase; and by reason of this, Zeckendorf's obligation to purchase these tendered shares at approximately $18.10 per share, or an aggregate price of over $8 million, became absolute. Also, Webb & Knapp's guarantee that Zeckendorf would meet this obligation likewise became absolute.

Subsequently, on February 11, 1958, Zeckendorf authorized the depositary agent to continue to accept and pay for all additional shares of Commodore stock which might be deposited with said depositary agent through February 28, 1958.

### Facts re Zeckendorf's Arrangements With New York Financial Group

In January 1958, Zeckendorf approached a group of New York financiers with a view to borrowing from them the amount necessary to meet its said obligation to purchase the tendered Commodore shares. The members of this group were: Tri-Continental Financial Corp.; Eastman Dillon, Union Securities & Co. (which was a partnership composed of about 30 individuals who are now petitioners in the transferee cases included in the instant consolidated proceeding); and also an individual named Roger L. Stevens, who held the controlling stockholder interest in Rostev Realty Corp. and its subsidiary named Stevens Development Corp., both of which handled important real estate matters. This group of financiers refused to make any loan directly to the Zeckendorf Corp., even if repayment were guaranteed by Webb & Knapp; but it did however indicate a willingness to enter into an arrangement with Zeckendorf, under which sufficient money could be provided for purchase of the Commodore shares that had been deposited with the depositary agent in accordance with Zeckendorf's offer to purchase the same.

The principal features of this financial arrangement which was thereupon worked out between Zeckendorf and said group of financiers, and which was thereafter reflected in several legal instruments and made effective in the early part of February 1958, may be summarized as follows.

(1) On February 4, 1958, a new corporation named Comtel Corp. (the principal petitioner in the present consolidated cases) was organized under New York law; and all shares of its capital stock were issued in equal one-third portions to the following: Tri-Continental Financial Corp. (the corporate member of said financial group); Eastman Dillon, Union Securities & Co. (the partnership member in said group), and the Zeckendorf Corp. (acting through a nominee named David G. Baird). Neither Roger L. Stevens nor either of his controlled corporations became stockholders.

(2) On or before February 11, 1958, Comtel was supplied with $8,663,855 in cash, being an amount which was slightly in excess of the sum that Zeckendorf required for payment on the Commodore shares which had been deposited with the depositary agent pursuant to its offer to purchase the same. The sources of this cash were:

$1,900,000 was paid into Comtel for its capital stock, by its three above-named stockholders in equal portions of $633,333 each; and

$6,763,855 was obtained from a loan made in Comtel's name with the Irving Trust Co., New York City. Comtel at that time had no assets other than the said cash paid in by its three stockholders; and therefore the loan was both arranged and guaranteed by Rostev Realty Corp.—even though, as before stated, neither this corporation nor Roger L. Stevens who controlled it, was a stockholder of Comtel.

The above amount of over $6,700,000 borrowed from Irving Trust Co. was so calculated as to be equal to $14 of Zeckendorf's obligation to pay $18.10 per share for purchase of the Commodore shares; and the above amount contributed by Comtel's three stockholders was so calculated as to approximate the remaining $4.10 of Zeckendorf's said per-share obligation.

(3) On this same date of February 11, 1958, these parts of the over-all arrangement between Zeckendorf and the financial group were given effect:

(a) Comtel paid over either to Zeckendorf or to its depositary agent, such portion of the cash that it had acquired in the above-described manner, as was sufficient to enable Zeckendorf to discharge its obligation to purchase the 442,972 shares of Commodore stock which had up to that time been deposited with the depositary agent. And shortly thereafter Comtel similarly paid over to Zeckendorf or the depositary agent, sufficient additional cash to enable Zeckendorf to discharge its obligation to pay for about 10,038 more Commodore shares which it had directed the depositary agent to continue to acquire up until February 28, 1958. The total sum so paid by Comtel to or for Zeckendorf was $8,200,091.13.

(b) At this same time, Zeckendorf purportedly "sold" to Comtel pursuant to one of the conditions of the arrangement with the above-mentioned financial group, and at a "price" equal to the above-mentioned cash received, all of the Commodore shares which it had just acquired from the former public shareholders through the use of said cash.

(c) And then Comtel, similarly acting pursuant to the previously agreed overall arrangement, purported to concurrently "grant" back to Zeckendorf an irrevocable "option" to "repurchase" these same Commodore shares from Comtel—after expiration of a fixed period of slightly more than 6 months (i.e., only between August 15, 1958, and September 2, 1958), and upon payment by Zeckendorf to Comtel of a "purchase price" equal to the aggregate of the following amounts:

(1) An amount equal to the entire cash sum which Comtel had, as aforesaid, paid to Zeckendorf for its use in acquiring the Commodore shares from the former public shareholders; plus

(2) An amount equal to interest at 6 percent per annum on the principal amount of Comtel's loan from Irving Trust Co.—

which loan had been the source of most of the cash that Comtel had delivered to Zeckendorf; plus

(3) An amount equal to interest at 6 percent per annum on the $1,900,000 cash that Comtel had received from its own three stockholders—which contributions had been another source of the cash delivered to Zeckendorf; plus

(4) An amount equal to all legal fees and other expenses incurred by Comtel in connection with the above-mentioned "purchase" and "agreement-to-sell-back" arrangement; plus

(5) An additional sum of $600,000 (the method of computing which is not shown by the evidence).

One of the conditions of the above purported "purchase" and "agreement-to-sell-back" arrangement was that, during the period that Comtel held the Commodore shares subject to Zeckendorf's "option" to reacquire the same, Comtel was not entitled to sell, dispose of, pledge, or otherwise encumber any of said shares or any interest therein, except to provide additional security for Irving Trust on its above-mentioned loan, if that became necessary.

(4) Other parts of the overall arrangement between Zeckendorf and the said financial group included the following:

(a) Zeckendorf agreed, "in order to induce" Tri-Continental Financial Corp. and the Eastman Dillon partnership to enter into the overall arrangement, and also in order to protect those organizations from loss in connection therewith, that its (i.e., Zeckendorf's) equal one-third stock investment in Comtel would be *subordinated in payment* to prior payment in full of the entire investments of said other two stockholders, plus 6-percent interest thereon; and also to reimbursement of any expenses incurred by these other two stockholders in enforcing this subordination feature.

(b) Also, Webb & Knapp agreed, "in order to induce" Tri-Continental and Eastman Dillon to enter into said overall arrangement, *to indemnify the shareholders of Comtel* against any loss that might result to them from Comtel's entering into the above-mentioned "purchase" and "agreement-to-resell" arrangement with Zeckendorf, relating to the Commodore shares; and

(c) Webb & Knapp further agreed to pay to Roger Stevens (the one member of the New York financial group who did not become a shareholder of Comtel), the separate sum of $50,000 for his services to Webb & Knapp in arranging for the above-mentioned "purchase" of Commodore shares by Comtel.

(5) Finally, still other parts of the overall arrangement between Zeckendorf and the above-mentioned financial group pertained to various procedures and protective measures that would become effec-

tive in the event that Zeckendorf did not exercise its above-mentioned option to "repurchase" the Commodore shares from Comtel. Such contingency, as is hereafter shown, never occurred.

### *Facts re Zeckendorf's Reacquisition of the Commodore Shares*

On or about June 20, 1958 (which was a little more than 4 months after Comtel had purported to "purchase" the Commodore shares from Zeckendorf in the manner above described), Zeckendorf informed Comtel that it desired to exercise its option to "repurchase" all of these shares; and also that it had made a new arrangement with a person named Evelyn Lubin (wife of a New York realtor), under which she would loan it sufficient funds to cover all payments required to be made in such circumstance. Comtel however, acting on advice of counsel, refused Zeckendorf's request for immediate redelivery of the Commodore shares. At that time, the restricted period for Zeckendorf's exercise of its said "option" (which period ran only from August 15 to September 2, 1958) had not yet arrived; the time during which Comtel had possessed the Commodore shares was less than 6 months (being the minimum period for measuring long-term capital gains) ; and also, until Comtel had held said shares for a period of at least 6 months, any profit resulting from the transaction possibly might not, by virtue of section 16(b) of the Securities Exchange Act of 1934 (48 Stat. 881, 896), redound to the benefit of Comtel and its stockholders.

In such situation, Comtel and Zeckendorf executed a new supplemental agreement on June 20, 1958—under which various revisions were made in their preceding arrangement, including the following:

(a) The period during which Zeckendorf could exercise its "option" to "repurchase" the Commodore shares from Comtel was deferred, so as to include a new period commencing on September 5, 1958, and ending September 15, 1958;

(b) The specific additional sum of $600,000, which Zeckendorf would have been required to pay to Comtel as part of the aggregate price for any "repurchase" of the Commodore shares, was reduced to $480,000; and

(c) Comtel's loan from Irving Trust Co. (which had been the principal source of the funds supplied by Comtel to Zeckendorf in connection with the latter's purchase of the Commodore shares from the former public shareholders), was replaced with a new loan, of larger amount and bearing a larger interest obligation, that was obtained from Evelyn J. Lubin. (This was the same person with whom Zeckendorf had theretofore made arrangements for a loan, in connection with its above-mentioned attempt to advance the time for its recovery of the Commodore shares.)

Subsequently, on September 4, 1958 (which was 1 day prior to the start of the revised period within which Zeckendorf could exercise its option to "repurchase" the Commodore shares), Zeckendorf again gave notice to Comtel of its intention to exercise said option to "repurchase." The following events thereupon occurred:

(a) On this same date of September 4, 1958, Comtel convened a special meeting of its board of directors; and then adopted a plan of complete liquidation, authorizing dissolution of the corporation and a prorata distribution of its assets to its stockholders on or before December 31, 1958.

(b) On the next day of September 5, 1958, Zeckendorf paid to Comtel (partly by assumption of a portion of Comtel's loan indebtedness to Evelyn J. Lubin) the prearranged amount required for its "repurchase" of the Commodore shares; and it thereupon recovered complete ownership and possession of all these shares. Immediately thereafter on this same date of September 5, 1958, Zeckendorf caused Commodore Hotel, Inc., to be merged into it in a statutory merger.

(c) Furthermore on this same date of September 5, 1958, Comtel completely liquidated and made final liquidation distribution to its stockholders, entirely in cash. The corporation's certificate of dissolution was, as previously stated, filed with the secretary of state of the State of New York on October 23, 1958.

In the final Federal income tax return which Comtel thereafter filed for the period from February 1, 1958, to September 30, 1958, it reported: (1) That it had not realized any taxable income for said period, although it had derived what it regarded to be "nontaxable income" in the amount of $872,028.79 from the transactions hereinabove described; (2) that it had incurred deductible expenses aggregating $446,795.47 (consisting of interest in the amount of $324,295.46, a management fee of $120,000, professional services of $2,000, and miscellaneous expense of $500.01—without any deduction being claimed for any rents, salaries, wages, or other operating expenses except as above mentioned); and (3) that it did not have any income tax liability. Both in its books of account and in its said income tax return, it regarded the above-mentioned amount, which it treated as "nontaxable income," to be "gain * * * from the sale or exchange by it of property" during its liquidation—and therefore not recognizable for income tax purposes under section 337(a) of the 1954 Code.

The Commissioner of Internal Revenue, in his notice of deficiency herein, determined: (1) That said undisputed amount of $872,028.79, which Comtel treated as being nontaxable income from the transactions hereinabove described, constituted ordinary income to said corporation, which is not subject to the nonrecognition of gain or loss provisions of section 337 of the 1954 Code; and (2) that in the alter-

native, Comtel was a "collapsible corporation" within the meaning of section 341 of the Code, and for such reason also, section 337 is not here applicable. Respondent thereupon determined the deficiency of $215,621.33 in Comtel's income tax, which is here in dispute.

1. The transactions between Comtel Corp. and Zeckendorf Hotels Corp., although in form a "purchase" by Comtel of most of the shares of Commodore Hotel, Inc., from Zeckendorf, with a concomitant option in the latter to "buy back" the same shares a few months later at an increased "price," which was then given effect—were in substance and reality merely steps in carrying out a previously arranged financing plan for Zeckendorf, which produced substantial gain or profit for Comtel and also for Comtel's stockholders following said corporation's immediate complete liquidation.

2. Comtel's gain or profit from said transactions constituted taxable ordinary income to it, in the nature of interest on money loaned and compensation for financing services rendered.

3. The nonrecognition of gain or loss provisions of section 337(a) of the 1954 Code are not applicable to Comtel's said gain or profit.

OPINION

The principal controversy in this case, as we have hereinabove indicated, is: What was the true legal nature of the transactions between Comtel Corp. and Zeckendorf Hotels Corp., that resulted in Comtel's realization of undisputed gain or profit of $872,028.79— which Comtel now contends is not recognizable for income tax purposes? Did these transactions actually represent a *purchase* by Comtel from Zeckendorf of the complete beneficial and legal ownership of nearly all the outstanding shares of Commodore Hotel, Inc.—followed a few months later by a *sale back to Zeckendorf* of the same interest in these identical shares at a greatly increased price? Or on the other hand, were these transactions, in substance and reality as distinguished from form, merely steps in a complex, prearranged financing plan: Under which Comtel temporarily supplied funds to Zeckendorf for meeting an existing obligation to buy said Commodore shares; under which Comtel held said shares as security for its loan; and under which Zeckendorf then repaid the loan in full, together with additional prearranged amounts which were in the nature of interest on money loaned and compensation for financial services rendered?

At the outset, it should be observed that the form of a transaction, although of some evidentiary value, is not conclusive as to the true

character of the transaction. Rather, as the Supreme Court stated in *Commissioner* v. *Court Holding Co.*, 324 U.S. 331—

The incidence of taxation depends upon the substance of a transaction. * * * the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

To the same effect, see *Emanuel N.* *(Manny) Kolkey*, 27 T.C. 37, affd. 254 F. 2d 51 (C.A. 7). See also *Gregory* v. *Helvering*, 293 U.S. 465.

Also, the manner in which parties to a transaction have classified the same on their books of account is not conclusive. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179.

Moreover, it has been widely recognized in numerous cases that a deed or bill of sale which appears on its face to convey title absolutely, may nevertheless be found from a consideration of all the facts and surrounding circumstances to constitute merely a device for providing security for money loaned, such as a mortgage. *Mooney* v. *Byrne*, 163 N.Y. 86, 57 N.E. 163, recently cited in *Wallace* v. *McCabe*, 245 N.Y.S. 2d 854 (1964); *Hughes* v. *Harlam*, 166 N.Y. 427, 60 N.E. 22, 23–24; *Gore* v. *Glover*, 40 Misc. 473, 97 N.Y.S. 969. See also the numerous cases collected in 33 A.L.R. 2d 364, 369–374, in annotation entitled "Bill of Sale, absolute on its face, as a chattel mortgage."

In applying the foregoing principles in the instant case, we have considered and weighed all the evidence, including the extensive stipulation of facts, the testimony, and all instruments and documents (several lengthy and complicated) received as exhibits. From all this, we are convinced as is indicated in our Findings of Ultimate Facts, and we here hold: (1) That the transactions between Zeckendorf and Comtel which produced for Comtel the above-mentioned undisputed gain or profit of over $872,000, were in substance and reality, notwithstanding the form in which they were couched, merely steps in a complex financing plan to temporarily make over $8 million in cash available to Zeckendorf at a prearranged price; and (2) that Comtel's said undisputed gain or profit from said transactions was in the nature of interest on money loaned and compensation for financing services rendered—and is taxable to it as ordinary income.

Among the several factors that we have considered to be particularly significant, in arriving at our said ultimate findings and holdings, are the following.

1. This case arose from the facts that Zeckendorf Hotels Corp. undertook on October 9, 1957, to purchase all of the outstanding shares of Commodore Hotel, Inc., for the purpose of merging that corpora-

tion into itself; that it intended and planned to finance such purchase by use of borrowed funds; that up to February 11, 1958, it did acquire from public stockholders of Comtel approximately 91.68 percent of all of the Commodore shares outstanding, at an aggregate price of over $8 million; and that, following the completion of the transactions with Comtel here involved (covering a period of about 7 months), Zeckendorf did attain its objective of becoming the complete equitable and legal owner of all of said Commodore shares, and of then folding the Commodore Hotel corporation into itself by means of a statutory merger. We are satisfied from the evidence as a whole that neither the Zeckendorf corporation nor its parent, Webb & Knapp, Inc., which guaranteed the said project, did at any time deviate from the above-mentioned objective; and we also are convinced that the Zeckendorf corporation, in its advancement of such objective, neither intended to nor did surrender complete ownership of the Commodore shares to Comtel at any time.

2. As regards the New York group of financiers who were principally responsible for creating Comtel and for supplying it with a prearranged amount of over $8,600,000 in cash by means of investments and bank loans—we are convinced that the primary objective of this group was not to embark on a new hotel operation, but was rather to procure for the participating financiers practically *risk-proof security* for their advancements, plus an exceedingly handsome *yield* or *profit* from the overall financial arrangement.

In order to obtain such risk-proof security, these financiers required Zeckendorf to become a one-third investor in Comtel by putting up $633,333 cash; by having Zeckendorf then *subordinate* any right of payment, in respect of its said investment, *to prior payment in full* of the investments of the other two stockholders who were members of the financial group; and also by having Zeckendorf's parent, Webb & Knapp, Inc., *indemnify the Comet shareholders* against any loss, through in effect guaranteeing them a 6-percent return on their investments, plus a recovery of all their expenses. In addition to all the foregoing, the financiers arranged that Comtel would, under the purported "purchase" and "sell-back" transaction here involved, hold the Commodore shares for what we are convinced was never intended to be other than a means for obtaining still further "security," during the approximately 7-month period that Zeckendorf was allowed for making repayment of the more than $8 million cash which it had borrowed, plus the prearranged compensation for temporary use thereof.

3. The rights of Comtel in respect of the Commodore shares during the period that Zeckendorf retained the "option" to recover the same, were similar to those of a mortgagee. Specifically, Comtel covenanted

and agreed that during the period it held the Commodore shares subject to Zeckendorf's "option," it would not be entitled to sell, dispose of, pledge, or otherwise encumber these shares or any interest therein, except possibly to provide additional security for the Irving Trust Co. loan, if such became necessary. Thus in our opinion, Comtel never was intended to obtain, nor ever did obtain, complete ownership of the Commodore shares.

4. The profit which the New York financiers intended Comtel to realize from their arrangement was not expected to result either from appreciation in the value of the Commodore shares over the 6- or 7-month holding period or from operation of the Commodore Hotel during such period. Rather such profit was expected to result from the prearranged fixed payment of $600,000 (later revised to $480,-000), plus an amount equal to 6 percent interest on the sums which the stockholders of Comtel paid for their stock, plus an amount equal to 6 percent interest on the Irving Trust Co. loan, plus another amount equal to all expenses incurred by Comtel.

5. The period intervening between Comtel's purported "purchase" of the Commodore shares and the date on which Zeckendorf was entitled to "repurchase" the same, was very short; was all prearranged; was not fixed with regard to the happening of any external event; and appears to have been calculated with regard to the 6 months' holding period of section 16(b) of the Securities Exchange Act of 1934. Moreover, within such specified period (which was thereafter extended so as to better accommodate Comtel and its stockholders with respect to said act), Zeckendorf could, in its discretion, and actually did, recover complete equitable and legal ownership of the Commodore shares, by merely repaying the sum which had been advanced to it, plus the above-mentioned additional amounts which respondent contends were in the nature of interest and compensation—all in the same manner as if the transaction had been cast in the *form* of a conventional purchase-money mortgage.

It is true that Zeckendorf was not obligated, in so many words, to exercise the "option." But from a realistic standpoint, it was practically compelled to exercise the same—(1) in order to protect itself from the potential loss of its entire $633,000 investment in Comtel, by reason of its subordination of this investment to the interests of the other two stockholders; (2) in order to protect its parent, Webb & Knapp, from an even larger potential liability under the latter's above-mentioned indemnification agreement; and (3) also to prevent Zeckendorf from losing the benefit of all the efforts and expenses which it had already incurred in acquiring the Commodore shares from the public stockholders, in negotiating and arranging for the financing of the purchase of these shares, and in planning for the subsequent stat-

utory merger of Commodore Hotel, Inc., into itself—as was actually done on September 5, 1958.

Based on our above-mentioned holding with respect to the first question underlying the basic issue here involved, we decide both said question and also said basic issue in favor of the respondent. By reason of this, it is unnecessary for us to consider the second underlying question above mentioned, i.e., whether Comtel was a "collapsible corporation."

Regarding the 31 transferee cases, which are included in this consolidated proceeding, we hold, on the basis of our holding in the Comtel case and in accordance with the above-mentioned preliminary agreement of all parties, that each of the petitioners herein is liable, as a transferee of assets of the Comtel Corp., for payment of the deficiency in the income tax of Comtel to the extent indicated in the notice of transferee liability issued to the particular petitioner, plus interest as provided by law.

*Decisions will be entered under Rule 50.*