Claude E. Skinner v. Commissioner.
Skinner v. Commissioner
Docket No. 2237-65.
United States Tax Court
T.C. Memo 1968-138; 1968 Tax Ct. Memo LEXIS 166; 27 T.C.M. (CCH) 680; T.C.M. (RIA) 68138; June 27, 1968, Filed *166 James J. Waters, 922 Walnut St., Kansas City, Mo., for the petitioner. Donald W. Geerhart, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined a deficiency in petitioner's income tax liability for the year 1960 in the amount of $9,645.37 resulting solely from his conclusion that petitioner received ordinary gain of $37,500 for a covenant not to compete instead of capital gain on the sale of stock as reported. Petitioner herein and his wife sold their stock of a cement company for the total consideration of $75,000. The final written 681 contract of sale contained a covenant in which the sellers promised not to compete with the corporation for a specified period of time within a given distance of its home office. The written contract assigned onehalf of the total consideration to the sale of stock and one-half to the covenant. The legal issue with which we initially must deal concerns whether this Court should look behind the contract in a situation such as this in order to examine the substance of the transaction, or whether the tax should be assessed upon the face of the contract. If we may look past the face *167 of the document, we then must determine whether the amount purportedly received by petitioner and his wife for the covenant not to compete in fact reflected payment for that promise, or was in reality a part of the payment for the stock. If the payment was for the promise, the amount received therefor was ordinary income to petitioner. If, however, the payment in reality was not for the promise, but instead the entire consideration was for the stock, then petitioner is entitled to capital gain treatment on the entire amount. Findings of Fact Those facts which were stipulated by the parties are found accordingly and adopted as our findings. Other facts relevant to the issue presented are set forth below. Claude E. Skinner (hereinafter called Claude or petitioner) and Nellie M. Skinner were husband and wife and filed their joint income tax return for 1960 with the district director of internal revenue at Kansas City, Missouri. Petitioner's legal residence was Camdenton, Missouri, at the time the petition was filed. [1]
*168 Claude E. Skinner was born on April 8, 1907, at Mack's Creek, Missouri, in an area commonly known as the "Ozarks." He lived most of his life in Camden County, Missouri, not far from Mack's Creek. He had only a sixth-grade education. Camdenton is approximately 148 miles from Kansas City. Claude was released from military duty in World War II because of a very serious back injury. He also was plagued with frequent stomach problems, and was the victim of a generally poor physical condition. Following his return to civilian life, Claude and his brother-in-law, Charles Lewis, went into the trucking and excavating business together in Kansas City. In 1954, Claude purchased a 225-acre farm in Camden County and went there nearly every weekend and other times just as frequently as possible. Claude hoped to live on the farm after his years in business were completed. Charles left Kansas City for Camden County in 1957 where he entered the real estate business. Soon thereafter, Claude asked Charles to look out for ground in Camden County so that they could go into business there together. In 1957, Claude went into a business with Miller J. Fields, known as Lee's Summit Ready-Mixed Concrete *169 and Materials Company, hereinafter sometimes referred to as Ready-Mix. The business operated in the Kansas City area with Claude and Miller as the only stockholders. Miller was vice president and Claude was president. In 1958, Claude and Miller each owned 50 percent of the outstanding Lee's Summit stock, but during that year they each sold half of his respective stock interest to Union Construction Company. Thereafter Union owned 50 percent, and Claude and Miller each owned 25 percent of the stock. George Bair, secretary-treasurer of Union Construction Company, became secretary-treasurer of Ready-Mix, while Miller and Claude retained their former offices. George was the "top man, the manager on the spot of the operation" and Claude was engaged mostly in selling. Claude and George were not able to get along well together in the running of Ready-Mix. Claude and Miller had a standing oral agreement that if either of them wanted to leave Ready-Mix the other would have the first chance to buy the withdrawing stockholder's stock. On or about April 1, 1960, Claude approached Miller and told him that he wanted to get out of the company, that "I have to get out," and that he had had about *170 all that he could take. Miller asked how much money Claude wanted for his stock, and Claude set a price of $75,000. No reference was made to any covenant not to compete. Miller and Claude then orally agreed to a sale and transfer of the stock at that price. The reasons for Claude's desire to leave Ready-Mix were his continuing poor health, his inability to get along with George Bair, and his continued intention and desire to return to the Ozark country. He could not have created any competition with Ready-Mix from that distance and Miller knew it. Apparently it did not occur 682 to either of them that such a covenant was even a possibility. No mention was made of a covenant not to compete by Claude or by Miller at any time before they agreed to sell and buy the 25 percent stock interest for $75,000. The oral agreement between Miller and Claude for sale of Claude's stock at a price of $75,000 was to be reduced to writing. Although Claude was a good salesman, he had only a sixth-grade education; he did not have a lawyer, but consulted and discussed the matter with his accountant, who advised him about the installment method of reporting gain on the sale of his stock and also that *171 if any allocation of consideration was made to a covenant not to compete he would realize ordinary income therefrom. Petitioner advised the accountant that his agreement with Miller was for a cash sale and that he wanted it that way so that he could get his money and go back to the Ozarks. He further told the accountant that no amount was to be put in the contract for a noncompetition agreement Miller arranged to obtain the $75,000 from Ready-Mix to purchase Claude's interest and agreed to asign the stock to Ready-Mix when it was acquired. Ready-Mix and Union Construction were both represented by a Kansas City lawyer, who happened to have offices at that time in the same building with petitioner's accountant. On April 8, 1960, George Bair, who, as we have indicated, was secretary-treasurer of both Union Construction and Ready-Mix, and Miller Fields met to discuss the terms of the sale. Bair or Miller communicated with the Ready-Mix lawyer to outline the transaction and have a contract prepared. The record does not disclose what transpired during that conversation. Claude, Nellie, and Miller attended a meeting on April 9, the following day, in the lawyer's office, by prearrangement. *172 At that time a proposed contract was presented which contained a covenant binding petitioner and Nellie not to compete with Ready- Mix for five years within an area of 50 miles of Lee's Summit, Missouri. This covenant and an allocation of the total consideration, one-half to the stock and one-half to the covenant had been placed in the contract by the lawyer as a tax-saving device for his client, Ready-Mix. The record does not disclose whether this was in accordance with Bair's instructions or on the lawyer's own motion on behalf of his client, Ready-mix but it was not known to Miller or to petitioner. The geographical area covered by the covenant was discussed when petitioner became aware of the covenant itself. Petitioner did not object to the covenant, but he objected to the 50-mile area, and requested that it be reduced. He and Miller then agreed on a smaller area. There was no discussion at any time concerning either the consideration involved, the allocation of part thereof to the covenant or the tax consequences. In fact, allocation of part of the total consideration for the covenant was never even mentioned to Claude at all by Miller or by the lawyer or by anyone else in Miller's *173 presence at any time. The allocation was also not mentioned or discussed by the lawyer with Miller at any time although he had arrived at the office before the Skinners and was alone with the lawyer on April 9 prior to their arrival for the closing. Claude had no previous knowledge of the existence of the proposed covenant itself until that morning in the lawyer's office, and at no time prior to execution of the agreement was he made aware of the allocation provision. Neither was Miller. Claude had invited his accountant, who had offices in the building, as previously mentioned, to drop by to see "him and mama get their check for $75,000." The accountant was late, however, and as he walked in, some 10 or 15 minutes after the meeting began, the lawyer was retyping the last page of the agreement to change the area of the covenant not to compete as previously discussed and agreed to by petitioner and Miller. The first page of the agreement, which contained all provisions thereof except the covenant not to compete, remained unchanged. No discussion of the covenant at all took place in the accountant's presence and he was unaware of the prior discussion; he gave no counsel or advice to *174 petitioner and was merely there as a spectator and because of his long friendship and association with petitioner. The completed agreement, with a retyped page two, was subsequently passed around for everyone to glance over. No one read it at that time and at no time thereafter during the conference was there any mention of or reference made to any consideration for the covenant or that the contract made any allocation between the price paid for the stock and the price allegedly paid for the covenant. Petitioner, Miller, Nellie and the accountant were all still unaware that onehalf of $75,000 was allocated to the covenant in the first paragraph. The contract was 683 then signed by the parties. As finally executed it read as follows: AGREEMENT THIS AGREEMENT entered into this 9th day of April, 1960, by and between C. E. SKINNER and NELLIE M. SKINNER, hereinafter referred to as sellers, and MILLER J. FIELDS, hereinafter referred to as BUYER WITNESSETH: WHEREAS, the Sellers have expressed the desire to sever all connections with the Lee's Summit Ready Mixed Concrete and Materials Company, including the sale of their stock in such corporation, and WHEREAS, the Buyer has *175 evidenced a desire to acquire all of the stock holdings of said Sellers, and WHEREAS, the Sellers state that they have no desire to engage in the type of business presently being conducted and contemplated by said corporation and to such end have indicated their willingness to enter into a non-competition agreement NOW THEREFORE IT IS AGREED AS FOLLOWS: 1. Consideration: For and in consideration of Seventy-Five Thousand Dollars and no cents ($75,000.00) in cash paid to the Sellers by the Buyer, such amount shall constitute the full consideration for this agreement and shall be considered by the parties hereto as divided in equal portions for the stock purchased and the covenant expressed herein. 2. Stock Sale: For the consideration set forth above, the sellers hereby sell to the Buyer, and he hereby purchases from said Sellers, the following stock in the Lee's Summit Ready Mixed Concrete and Materials Company presently owned by said Sellers: Three Hundred Twenty-Five (325) shares of $100.00 par value preferred stock, and Thirty (30) shares of no-par common stock At the time of the execution of this agreement and the payment of the consideration, the Sellers shall assign *176 their certificates, representing the above-named stock, to the Buyer. 3. Covenant Not To Compete: The Sellers further agree that neither of them shall in any way, shape or form compete with the Lee's Summit Ready Mixed Concrete and Materials Company, in its present or presently contemplated business operations for a period of five (5) years from the date of this agreement within the trade territory hereinafter defined. In carrying out this covenant, the Sellers agree that they, nor neither of them, shall so compete as individuals, members of a partnership, or as officers, stockholders or employees of any corporation, now or hereafter existing, for the period of time and within the trade area defined. As used herein, "trade territory" shall mean all of Jackson County, Missouri, and at any point within ten (10) miles of the City of Lee's Summit, Missouri. IN WITNESS WHEREOF, THE PARTIES hereto have set their hands and seals the day and year first above written. (s) C. E. Skinner (s) Nellie M. Skinner (s) Miller J. Fields After the agreement was signed and Claude, Nellie and their accountant had gone, the lawyer asked Miller to read the agreement again. He then pointed out *177 to Miller the clause allocating separate consideration to the covenant which had been inserted and its resulting tax benefits for Ready-Mix. He had not made any such oral notation for Claude's edification. Until that time, Miller did not know that the contract allocated any portion of the purchase price to the covenant. He understood that the allocation would be of tax benefit to Ready-Mix but he did not understand the other tax aspects of the allocation at that time. Shortly after the sale, Claude departed for the Ozark country. He arrived there in May of 1960 and visited his brother-in-law and sister for several weeks. In July 1960, he purchased land and contracted to have a garage, filling station, restaurant and grocery store constructed thereon. Claude was physically unable to run the operation himself, so he hired people to do most of the work. He did attempt to run the restaurant, but being unable to do so, he ceased that work soon thereafter. The farm had been profitable, but most of the actual work was done by hired hands. Claude's move to the Ozarks and his business activities there following the sale of his interest in Ready-Mix were in complete accord with plans he had *178 made many years prior to his retirement from Ready-Mix and consistent with his declining health situation. In the spring of 1961, petitioner consulted his accountant about the preparation of his 1960 income tax return; this was the same accountant who had attended the meeting on April 9, 1960, at petitioner's invitation 684 to see him receive his check for $75,000. The accountant was still unaware that the written agreement signed in his presence the previous spring contained any allocation of consideration to the covenant not to compete. As indicated previously, he did not read the agreement at that time and understood that there was no such allocation and that the entire consideration paid was for petitioner's stock in Ready-Mix. Accordingly, in preparing petitioner's income tax return for 1960, he reported capital gain on the sale of petitioner's Ready-Mix stock for $75,000. Petitioner, likewise, being unaware that the written contract allocated one-half of the price of the stock to the covenant, duly signed and filed the return. It was only subsequently that the accountant, who also performed accounting services for Ready-Mix, learned that the contract of April 9, 1960, allocated *179 part of the $75,000 consideration to the covenant. In connection with his preparation of the Ready-Mix tax return in 1961 for its fiscal year ended February 28, 1961, he discovered that there was an allocation of part of the consideration to the covenant. The audit of the books of Ready-Mix at that time disclosed how the cost of the covenant had been treated on its books. In 1963 the accountant obtained a copy of the contract for a revenue agent who asked to see it. This was the first time he read the agreement and saw that it contained an allocation of part of the consideration to the covenant. It that year he also discussed the matter further with Miller Fields who advised him that the oral agreement he had made with petitioner in 1960 had been to purchase his stock for $75,000 without any cost for the covenant and also that he (Miller Fields) did not know of the change placed in the written contract allocating one-half of the purchase price to the covenant until after the contract had been signed and petitioner and the accountant had left the lawyer's office. Sometime in 1962, Miller Fields and Ready-Mix entered into a contract for the sale of Miller's stock interest to the *180 corporation for a price of $47,500. His interest was identical to the stock interest disposed of by petitioner in 1960. That contract contained a covenant not to compete, to which a consideration of $1 was allocated. Ready-Mix had lost money during each of the years 1960 and 1961, as a consequence of a strike in 1960 and a subsequent price war among concrete companies. Consequently, Ready-Mix's financial position was not as good in 1962 as it had been in 1960. Miller thought, however, that the capital stock of Ready-Mix had approximately the same value in 1962 as in 1960, and that his stock was worth more than he was paid for it in 1962. He merely accepted what Ready-Mix would give him and got out. Apparently by that time he too had had all that he could take. Claude's physical condition continued to deteriorate after his return to the Ozarks and on September 8, 1965, he died in Camden County, Missouri. Ultimate Findings of Fact The parties to the contract of sale of petitioner's stock agreed to the sale of the stock alone for a total consideration of $75,000. The covenant was not bargained for as a separate item during negotiations so as to be deserving of consideration *181 severable from the sale of the stock. It had no independent basis in fact, and no relationship at all with business reality such that reasonable men concerned over their economic futures would bargain for it. Neither the seller nor the buyer knew that the final written contract, prepared by the lawyer for the corporation, which would ultimately acquire the stock for its treasury and which was the beneficiary of the noncompetition covenant, contained an allocation of part of the total consideration to the covenant not to compete. The contract as written was not the conscious agreement of the parties. No part of the total consideration of $75,000 received by petitioner and his spouse was for their covenant not to compete with Ready-Mix; it was entirely paid for their stock. Opinion According to the terms of the final written agreement, the total consideration of $75,000 was to be divided equally between the stock transferred and the covenant not to compete. In his 1960 joint income tax return, petitioner reported the difference between his basis and the full consideration of $75,000 as a long-term capital gain on the sale of his stock. The respondent, in his statutory notice of deficiency, *182 determined that only $37,500 was realized from the sale of stock, and $37,500 was realized as consideration for a covenant not to compete. The respondent's position, consistent with the fine print buried in the agreement, 685 divides the consideration eqully between the stock and the covenant. The result sought by respondent would be that the difference between $37,500 and petitioner's basis in the stock is long-term capital gain. The other $37,500, allegedly realized as consideration for the covenant not to compete, would all be ordinary income to petitioner. Respondent, relying on Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549 (1965), contends that the Court must accept the agreement on its face, absent a showing of fraud, duress, mistake, or undue influence, and that there is no such showing made here. Alternatively, he urges that applying other rules or tests adopted by courts before Danielson, he still should prevail because of petitioner's failure of strong proof to overcome the written allocation. Petitioner contends that the Court should not be bound to accept the agreement on its face, carte blanche, but should *183 look to the substance of the transaction. Fraud, duress, mistake, or undue influence need not be shown he contends; rather, the Court should adjudicate in such a fashion as to guarantee that the tax is levied upon the substance of the transaction, not upon the form of the agreement. In any event, petitioner urges that he was unaware of the allocation made by the written contract as was Miller Fields, the other party thereto. This being so, there was no meeting of the minds or conscious agreement as to this allocation by the parties to the agreement. We are not prone to ignore our judicial conscience when the result would require taxation based upon the mere form of the written agreement rather than upon the substance of the transaction. In the early case of Eisner v. Macomber, 252 U.S. 189 (1919), it was held that when deciding what is income and what is not, the Court must apply the distinction according to the substance, and without regard to the form. The "substance over form" doctrine of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), has become deeply *184 entrenched in our law. The respondent would have us believe, however, that application of the doctrine is restricted to the situation in which the Commissioner is challenging the form of the transaction. We cannot accept any such restriction of the doctrine. To do so would deprive the statutory provisions in question of their serious purpose. The judicially imposed doctrine of "substance over form" finds its purpose in the concept that the actual transaction should be the subject of the laws of taxation, and that the form chosen by the parties to clothe that slice of reality cannot dictate the application of the statute. It makes little difference to us which litigant requests the Court to examine the substantive reality of the transaction; we will do so because the statutes are designed to be applied to the substance and not to the form. The "substance over form" doctrine is merely a judicial pronouncement of the method in which the Court applies the statute. To restrict the doctrine as respondent requests would result in an exaltation of artifice over reality such that the statutory provisions in question would be deprived of all serious purpose. Cf. Gregory v. Helvering, 293 U.S. 465 (1935). *185 This Court has the power - indeed the duty - to look to the substance of the transaction, whether divining the substance benefits the taxpayer or the Commissioner. Comtel Corporation, et al. v. Commissioner, 376 F. 2d 791 (C.A. 2, 1967), affirming 45 T.C. 294 (1965). In a case such as the instant one we perceive it our duty to assign a probative value to each event in the transaction, so that we may properly view its essence. Although we will not restrict ourselves to the written document evidencing the covenant not to compete, and the assignment therein of a substantial portion of the total consideration to that covenant, we do not view the agreement lightly. See Ullman v. Commissioner, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957), where it was said that: when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. * * * [Emphasis supplied.] The Ullman *186 "strong proof" rule, providing that the assignment of price for the covenant in the written agreement may be overcome if the other elements of the transaction indicate that the written agreement is not reflective of the substantive reality of the transaction, has been cited approvingly so often that we cannot quarrel with its applicability here. See Montesi v. Commissioner, 340 F. 2d 97 (C.A. 6, 1965), affirming 40 T.C. 511 (1963); Barran v. Commissioner, 334 F. 2d 58 (C.A. 5, 1964), 686 affirming 39 T.C. 515 (1962); Levine v. Commissioner, 324 F. 2d 298 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; Schulz v. Commissioner, 294 F. 2d 52 (C.A. 9, 1961), affirming 34 T.C. 235 (1960); Benjamin Levinson, 45 T.C. 380 (1966); and Eleanor Lutz, 45 T.C. 615 (1966), reversed on another issue 396 F. 2d 412 (C.A. 9, June 3, 1968); and to the same effect see United Finance & Thrift Corporation of Tulsa v. Commissioner 282 F. 2d 919 (C.A. 4, 1960), affirming 31 T.C. 278 (1958); Hamlin's Trust v. Commissioner, 209 F. 2d 761 *187 (C.A. 10, 1954), affirming 19 T.C. 718 (1953); Commissioner v. Gazette Telegraph Co., 209 F. 2d 926 (C.A. 10, 1954), affirming 19 T.C. 692 (1953); and Lee Ruwitch, 22 T.C. 1053 (1954), acq. 1955-1 C.B. 6. The courts have used two basic tests in determining whether the substantive elements of the transaction will allow a treatment different from the written contract. The Ullman rule applies to either test so that strong proof will be required under any conditions to overcome the written provisions of the agreement. The "severability" test is the older of the two tests, and the most frequently utilized. We held in Aaron Michaels, 12 T.C. 17 (1949), that the Court must determine whether the covenant not to compete can be segregated from the rest of the agreement. If the Court determines that the covenant has been dealt with as a separate item, consideration received therefor will be ordinary income. If the covenant is not severable from the assets transferred, capital gains treatment will result. See, also, Toledo Blade Co., 11 T.C. 1079 (1948); Toledo Newspaper Co., 2 T.C. 794 (1943). *188 The oft-cited case of Hamlin's Trust, supra, resulted in general acceptance of this test. That case deduced that since the incidence of taxation depends upon the substance of the transaction, the effectiveness taxwise of the assignment of consideration for the covenant is measured by whether the parties understandingly entered into the covenant. Citing Aaron Michaels, supra, the Court reasoned that if the covenant can be separated from the other assets and was realistically bargained for so that the consideration is actually severable, then the consideration paid for it should in fact be ordinary income. The effectiveness of the agreement might thus be measured by whether the parties understandingly entered into it. In the present case, the covenant was not treated as a separate and distinct item in the negotiations, and the consideration was orally set for the sale of stock alone before the covenant was mentioned; under this rule the purchaser paid nothing for the covenant, so all the consideration must be capital gains to the petitioner. See, also, Lee Ruwitch, supra. Strong proof is present herein to convince us that no severable consideration *189 was bargained for in good faith for the covenant. In fact, it is perfectly clear from the evidence that the covenant was not bargained for at all nor did the parties intend to allocate any part of the agreed consideration to it. Since no consideration taxwise changed hands for the covenant, petitioner has no ordinary income resulting from his promise not to compete if the severability test is applied. The newer of the two tests, known as the "economic reality" test, was set forth in Schulz v. Commissioner, 294 F. 2d 52 (C.A. 9, 1961), affirming 34 T.C. 235 (1960). The standard used there for making the factual determination was set out, at 55: the covenant must have some independent basis in fact or some arguable relation-ship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. * * * If such an agreement had occurred freely, willingly, and knowingly, the courts would be reluctant to go beyond the terms of the agreement. Benjamin Levinson, supra. However, when the covenant has no basis in fact or arguable relationship with economic reality, then no reasonable *190 man would actually bargain for it. Tax laws should be applied to substantive economic reality. When the written agreement does not reflect that economic reality, then the covenant is in fact a sham as is assignment of price to the covenant also. In the instant case, a survey of the business realities involved justifies a determination that the buyer would not have bargained for the covenant because it was common knowledge that petitioner was never going to compete with the buyer and 687 in fact was in no position to do so. The parties agreed upon the price of the stock before any discussion of the covenant. A careful scrutiny of the situation shows the consideration allocated to the covenant to be a sham, totally without arguable relationship to economic reality. Finding that the covenant itself is a sham supplies the strong proof necessary to overcome the value assigned to the covenant by the agreement. Had the parties even discussed the consideration with a view merely related to the tax consequences, then some arguable relationship with economic reality might have been present. But no such discussion occurred, and we hold under this test that because the parties would not *191 have considered the covenant in reality, and because its consideration has no basis in fact, the parties would not in good faith have bargained for it and it is a sham. We cannot be bound by its form. Here, too, under this test we conclude that no consideration was in reality paid or received for the covenant, and so the entire consideration received by petitioner should be treated as realized in exchange for his stock, a capital asset held for more than six months. The tests used above to determine whether any consideration flowed in exchange for the covenant both find their bases in the philosophy of substance over form. They are merely two paths leading to the substance of the transaction. Although in application the tests may appear somewhat different, the ends sought are identical. Under the first, the covenant was not dealt with as a separate item, nor was the consideration severable from the sale of the stock. Under the second, there was no basis in fact for the consideration since reasonable men would not have bargained for such an agreement. Therefore, no consideration passed for it to which we can apply the statute. The facts adduced and conclusions reached under both tests *192 comprise strong enough proof to successfully overcome the clause allocating very substantial consideration to the covenant in the final written agreement. We realize that the effect of the agreement taxwise is not measured by the amount of preliminary discussion, but rather by whether the parties understandingly enter the agreement. We feel that the facts surrounding the entire transaction here show clearly that the allocation of consideration in the agreement is not reflective of the substance of the situation or the intention of the parties. As our findings reflect, the two parties to the written agreement - petitioner and Miller Fields - were business associates, each of whom originally owned 50 percent of the stock of their small corporation. After they each sold one-half of their stock to Union Construction, petitioner found that he could not get along with Bair, the new manager put in charge by Union. While Bair was nominally secretary-treasurer of Ready-Mix, he was "top man" described as the real manager of its operation. Petitioner was nominally president of Ready-Mix, but he was a minority stockholder and primarily engaged in sales work. Petitioner and Miller had long *193 had an understanding that if one of them desired to sell out he would offer his stock to the other. As time passed, petitioner's health declined and his difficulties with Bair grew more oppressive until he decided that "he had had about all he could take" and "wanted to get out of the company * * *" Petitioner offered to sell his stock to Miller for $75,000, and in Miller's words "he quoted a price which is what he finally got for it, and this was for stock only as far as I knew, as far as I was concerned, anyway." At no time did petitioner or Miller mention or discuss a covenant not to compete or any price or value to be ascribed thereto during any of their conversations or negotiations with respect to the sale of petitioner's stock. Actually, only about one week's time passed between the initial oral agreement between petitioner and Miller and the signing of the written contract on April 9, 1960. Miller consulted with Bair and "other members of the firm" and told them how much petitioner wanted for his stock. There was never any attempt to get him to lower his price. Petitioner, in turn, talked to his accountant, a CPA of long experience, good standing and excellent professional *194 reputation in the Kansas City area. After the CPA explained to petitioner the advantages of installment sale reporting and that if an amount was "placed in this agreement for covenant not to compete, this would be taxed as ordinary income," petitioner told him that "he wasn't [sic] interested in that [installment reporting], he was interested in getting his money and going to the Lake of the Ozarks," and that no amount was to be placed in the agreement for the covenant. 688 About a week later, on April 8, 1960, Bair and/or Miller communicated with the lawyer, who was employed by both Union Construction and Ready-Mix, to draw a written agreement. At no time did Miller discuss with him an allocation of part of the $75,000 consideration to the covenant not to compete. Bair apparently instructed the lawyer to add the covenant and allocate half of the consideration to it, or the lawyer, acting on his own motion in behalf of his client, Ready-Mix, added it. In any event, when petitioner, his wife Nellie, and Miller met at approximately 9:00 a.m. on Saturday morning, April 9, 1960, in the lawyer's office, a written contract was ready and waiting, and, unknown to both petitioner *195 and Miller, it contained what can only be described as a buried and deemphasized allocation provision and a covenant against competition, both direct and indirect, within 50 miles of Lee's Summit, Missouri. The contract was handed to petitioner and Nellie to look over, Miller having had a brief preview before their arrival. Miller had not been told that the consideration had been allocated equally between the stock and the covenant. At that time petitioner's accountant was not present. After petitioner looked it over, he objected to the extent of the territory described in the covenant. He and Miller then agreed to limit the area to all of Jackson County, Missouri, and "any point within ten (10) miles of Lee's Summit, Missouri." This was in lieu of the 50-mile area specified in the original draft. No mention whatever was made by anyone at any time of the provision in article one of the agreement as to consideration, which read as follows: 1. Consideration: For and in consideration of Seventy-Five Thousand Dollars and no cents ($75,000.00) in cash paid to the Sellers by the Buyer, such amount shall constitute the full consideration for this agreement and shall be considered by the *196 parties hereto as divided in equal portions for the stock purchased and the covenant expressed herein. The Ready-Mix lawyer then retyped page 2 of the contract changing the noncompetition area as agreed to by the parties. It was while he was so engaged that petitioner's accountant arrived on the scene. All told, the participants had only been in the lawyer's office a short time, some 10 or 15 minutes. The accountant was not present to advise petitioner or to be consulted by anyone, and he offered no advice whatever. He had his office in the same building and merely dropped in to see petitioner and Nellie culminate their dreams and plans by selling out for $75,000 so that they could go back home to the Ozark country. Neither petitioner, Miller nor the accountant read the final agreement before it was signed, which took only a few minutes. Petitioner got his check, and with Nellie and the CPA departed. No one at any time mentioned any allocation of consideration to the covenant not to compete or that the agreement specified that it be considered by the parties as one-half of the total consideration of $75,000. The lawyer then had Miller read over the contract again, and in Miller's *197 words: So he pointed out this clause to me which was worded in such a manner that half the purchase price of the stock went to the covenant not to compete [Emphasis supplied.] The entire record convinces us that neither petitioner nor Miller, the two parties to the written contract, knew or were in anywise conscious or aware that the lawyer for Ready-Mix had skillfully inserted language in the first article dividing the price of the stock agreed upon by the parties equally between the stock and the covenant. Keeping in mind that petitioner was a man from the Ozarks, in poor health, and with only a sixth-grade education, we conclude that even if he had read the entire contract, which we do not believe was the case, he did not understand the effect and import of the final wording of the first article. He had been advised within the previous week that if the contract allocated consideration to a covenant not to compete, it would result in ordinary income to him and he told his accountant that this was not to be the case and was not the agreement with Miller. Miller himself later confirmed to petitioner's accountant that his agreement with Claude was to pay $75,000 for his stock *198 and that no value was to be placed upon the covenant not to compete; that he was unaware that the written contract contained an allocation until after it had been executed. An examination of the contract itself is significant. It states that the consideration of $75,000 is "the full consideration for this agreement * * *" which was the case, and then goes on "and shall be considered by the parties hereto as divided in equal portions for the stock and the covenant 689 expressed herein." Immediately before this article, in the final WHEREAS clause, the noncompetition portion is referred to, not as a "covenant," but as an "agreement." Thereafter, nowhere in the document is there any division whatever of the consideration, and except for a recital that the shares of stock are sold for "the consideration set forth above" in the stock sale article, article 2, which immediately follows the provision that "in consideration of Seventy-Five Thousand Dollars and no cents ($75,000.00) in cash paid," there is no reference to consideration at all, except at the end of the "Stock Sale" article itself. No consideration is mentioned either in general terms or in specific dollar amount for the *199 "Covenant Not To Compete," in article 3, and we believe it noteworthy that in the earlier portions of the written contract this noncompetition article is first referred to as "a non-competition agreement" and then merely called "the covenant expressed herein" when the equal division of consideration is effected at the end of the "Consideration" article, article 1. We also deem it noteworthy that nowhere is there any stated dollar breakdown between the stock and the covenant, either initially or in the articles dealing specifically with those two items. At the time of trial, Claude Skinner was dead and unable to testify. However, in an affidavit submitted to the Internal Revenue Service in 1964, admitted in evidence at the trial without objection, he made the following statement: My wife and I arrived at the office of the company's attorney, Mr. Charles C. Shafer, Jr., April 9, 1960 for the purpose of closing the deal. Mr. Miller J. Fields was there at the time of our arrival. Later Mr. Raymer Hodson, our Certified Public Accountant, arrived. Mr. Fields and perhaps Mr. Shafer discussed with me the question of an agreement not to compete to which we had no objection because of our *200 intention to go to Camdenton. At no time during the discussion was any price, amount or consideration mentioned for the covenant not to compete. It is my recollection that Mr. Shafer was typing the contract. Upon its completion he handed it to us and said, "Well, here it is". Mrs. Skinner, myself and Mr. Fields signed the contract and Mr. Shafer gave me a check drawn by Miller J. Fields for $75,000.00. I do not now remember whether Mrs. Skinner or I read the contract as we were interested only in selling our stock. If I did read the contract I did not understand it. I do know that there was absolutely no conversation about a price for an agreement not to compete. We believe that this accurately described the transaction and situation. We are likewise convinced that Miller Fields, the other party, knew nothing about the allocation of consideration provision at the time the contract was signed. Neither party therefore intended that there be any such allocation, and there was no meeting of the minds of the contracting parties as to such allocation. That Miller was also unaware of the provision until after the contract was signed is clear from the record, and we need not repeat the evidence *201 that leads us to the conclusion that there was a mutual mistake which was never contemplated or intended. Courts should not "honor a covenant slipped into a sales contract for tax purposes by one party to the disadvantage of a tax-ignorant party." Balthrope v. Commissioner, 356 F. 2d 28 (C.A. 5, 1966), affirming a Memorandum Opinion of this Court. Certainly we should not honor or be obligated to accept in toto an allocation provision slipped into a sales contract for tax purposes by the lawyer for a thirdparty beneficiary without the knowledge of either party to the contract. No useful purpose would be served by characterizing the happening as "a subtle, legalistic shell game" as petitioner urges on brief. Suffice it to say that upon this record we must hold that whatever test is applied and even under the rationale of Danielson v. Commissioner, 378 F. 2d 771 (C.A. 3, 1967), reversing 44 T.C. 549 (1965), urged upon us by respondent as a new rule, the purported allocation cannot be recognized or given effect for tax purposes. We therefore conclude that petitioner correctly reported the $75,000 received in 1960 as an amount realized from the *202 sale of his stock in Ready-Mix and that no ordinary income was received for a covenant not to compete granted in connection with the sale of that stock. The respondent's determination was not proper and cannot be sustained because it was based solely upon the form of the written agreement between the parties, which form contained an allocation of consideration unintended and unknown by the parties upon which there was no meeting of their minds. Under any suggested test, petitioner must prevail. Decision will be entered for the petitioner. 690 Footnotes
1. Nellie predeceased Claude, who subsequently died on September 8, 1965. The petition was filed by Claude after Nellie's death. Claude's death occurred prior to trial.↩