T.C. Memo. 1996-131

UNITED STATES TAX COURT

COMPUTERVISION INTERNATIONAL CORP., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

COMPUTERVISION CORPORATION AND SUBSIDIARIES, Petitioners[1] v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 25134-93, 25135-93.        Filed March 18, 1996.

John S. Brown, George P. Mair, Donald-Bruce Abrams, Jody E. Forchheimer, for petitioners.

Charles W. Maurer, Jr. and John C. Galluzzo, Jr., for respondent.

---

[1] These cases have been consolidated for purposes of trial, briefing, and opinion and shall hereinafter be referred to as the instant case.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>: Respondent determined a deficiency of $9,460,419 in the Federal income tax of petitioner Computervision International Corp. (CVI) for its taxable year ended January 31, 1984.

Respondent determined the following deficiencies in the Federal income tax of petitioners Computervision Corp. (CV) and subsidiaries for the following years:

| Taxable Year Ended | Deficiency |
|---|---|
| Dec. 31, 1983 | $25,226 |
| Dec. 31, 1984 | 32,279 |
| Dec. 31, 1987 | 4,720,840 |
| Feb. 5, 1988 | 570,819 |

After concessions, the following issues remain for decision:

(1) Whether CVI qualifies as a domestic international sales corporation (DISC) for its taxable years ended January 31, 1983 and 1984;

(2) whether petitioners are entitled to net interest income against interest expense in calculating CV's deduction for commissions payable to CVI with respect to each of CVI's taxable years ending January 31, 1983 and 1984, and December 31, 1984; and,

(3) whether the net proceeds of the sale of a certain stock warrant held by CV are long-term capital gain, ordinary income, or a reduction in CV's cost of goods sold.

FINDINGS OF FACT

Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.  Some of the facts have been stipulated for trial pursuant to Rule 91.  The parties' stipulations are incorporated in this Memorandum Opinion by reference and are found accordingly except as noted below with respect to certain stipulations to which objections were reserved.

General Background

The principal place of business of both CV and CVI was Bedford, Massachusetts, at the time each filed its petition in the instant case.  CV, a Delaware corporation, designs, manufactures, and sells computer-aided design, computer-aided manufacturing, and computer-aided engineering (CAD/CAM/CAE) products.  CV maintains its books and records on an accrual accounting basis using a calendar year.[2]  During relevant periods, CVI, a Massachusetts corporation, maintained its books and records on an accrual accounting basis using a fiscal year ending January 31.[3]  During CV's and CVI's taxable years ending

---

[2] In 1988, however, CV, together with at least certain of its subsidiaries, filed a consolidated Federal income tax return for the period beginning Jan. 1, 1988, and ending Feb. 5, 1988.

[3] In 1985, however, CVI, filed a Form 1120-DISC for the period
(continued...)

in 1983 and 1984, CVI was a wholly owned subsidiary of CV.

DISC Qualification Issue

CVI was organized in 1972 to serve as a sales agent for CV with respect to CV's sales of its products to customers located outside the United States.  CVI qualified as a DISC for each of its taxable years ending prior to the taxable years for which its DISC status is in issue in the instant case (viz, its taxable years ending January 31, 1983 and 1984 (relevant taxable years)). Throughout the periods relevant to the instant case, Martin Allen was CVI's president, Richard Krieger was its treasurer, and James Spindler was its clerk.  They were also the directors of CVI.

CV and CVI entered into a series of agreements with respect to their export sales activities.  Under a written agreement entitled "Commission Agreement" (commission agreement) dated as of March 22, 1972, that was in effect during the periods relevant to the instant case, CVI was appointed CV's sales agent with respect to CV's sales of CV's products to customers located outside the United States.  The commission agreement provided that, in exchange for services provided under the agreement, CVI would receive a commission equal to the maximum amount allowable pursuant to section 994.

Pursuant to a written agreement entitled "Agreement Designating Foreign Marketing Departments and Related

---

[3](...continued)
beginning Feb. 1, 1984, and ending Dec. 31, 1984.

Intercompany Accounts" (export promotion agreement) dated as of February 1, 1980, that was also in effect during the periods relevant to the instant case, certain departments within CV were designated foreign marketing departments of CVI for purposes of accounting for export promotion expenses within the meaning of section 994(c) to be incurred by CVI and certain accounts were designated as export promotion expense accounts. Pursuant to the export promotion agreement, CVI obligated itself to reimburse CV annually for export promotion expenses accounted for in the designated accounts that were to be paid by CV in the first instance. The export promotion agreement provided that CV would bill the expenses to CVI at the close of CVI's fiscal year and that the amount due was payable within 60 days after billing.

Pursuant to a written agreement entitled "Accounts Receivable Purchase Agreement" (master receivables purchase agreement) dated as of January 31, 1981, CVI was authorized to purchase from time to time an undivided interest in CV's accounts receivable arising from certain of the types of transactions that give rise to qualified export receipts pursuant to section 993(a)(1) and on which CVI was entitled to receive a commission (qualified export receivables). Pursuant to the master receivables purchase agreement, the purchase price to be paid for the undivided interest in the qualified export receivables was to be determined at the time of purchase and was to reflect a reasonable discount on the amount of the receivables purchased.

The agreement also provided that CV would produce, upon demand by CVI, a list of the qualified export receivables in which CVI had an interest, including the identity of the account debtor, the amount of each receivable, and the date on which it arose. CV was required to bill and collect all payments on the qualified export receivables in which CVI had an interest on CVI's behalf and, unless requested to remit the proceeds to CVI, to substitute an undivided interest in additional receivables for those discharged.

Using the commissions paid it by CV, CVI, pursuant to the master receivables purchase agreement, periodically purchased at a discount interests in CV's qualified export receivables that were qualified export assets within the meaning of section 993(b). During its 1981 taxable year, CV entered into the following sales of qualified export receivables to CVI at a discount under the master receivables purchase agreement:

| Date of Sale | Receivables Face Amount |
|---|---|
| Oct. 1, 1981 | $23,345,288 |
| Oct. 15, 1981 | 1,874,000 |
| Dec. 1, 1981 | 4,028,369 |

Under the terms of the sales, CV was obligated to pay to CVI all proceeds collected with respect to CVI's interest in the qualified export receivables on September 30, 1982.

During 1982, CV made an election to use the installment method to report its income with respect to domestic and foreign sales. Because CV believed that further purchases of qualified

export receivables by CVI would result in recognition of income by CV at the time of the purchases, a plan was developed during September 1982 by CV's tax department and its outside accountants, Price Waterhouse, both to avoid recognition of income from the purchase of qualified export receivables and to maintain CVI's status as a DISC (the plan). Under the plan, when CV became obligated to pay CVI the proceeds collected with respect to CVI's interest in the qualified export receivables on September 30, 1982, CVI would use the proceeds of the investment to fund demand loans to CV that would not be "qualified export assets" within the meaning of section 993(b). CVI would call those loans prior to the end of its taxable year and use their proceeds to (1) purchase qualified export receivables, (2) reimburse CV for export promotion expenses incurred on behalf of CVI, and (3) pay a dividend to CV. It was expected that the execution of the plan would cause CVI to satisfy the 95 percent of assets test provided by section 992(a)(1)(B) at the close of its taxable year. The plan was approved by Mr. Krieger and Mr. Spindler. By purchasing CV's qualified export receivables at the end of January of 1983, CVI sought to minimize the amount of the receivables that might be paid before the end of its taxable year because the conversion of the receivables to cash could have caused CVI to fail the 95 percent of assets test.

The following series of events occurred pursuant to the plan. First, CVI made demand loans to CV on the following dates

in 1982 in the following amounts:

| Date | Amount of Loan |
|------|----------------|
| Sept. 30 | $27,272,888.00 |
| Oct. 29 | 1,142,311.00 |
| Nov. 1 | 1,135,689.50 |
| Nov. 16 | 1,046,278.76 |
| Dec. 1 | 1,099,944.32 |

Then, on January 27, 1983, CVI made written demand for payment of both the principal amounts of the loans (viz, $31,697,111.58) and accrued interest thereon (viz, $1,386,326.55), which totaled $33,083,438.13.  On January 31, 1983, the following occurred: (1) CV wired the sum to CVI in full payment of the principal amounts and interest, and the sum was deposited in CVI's account with the First National Bank of Boston; (2) CVI received the proceeds of two maturing time deposits, totaling $5,663,970.38, that were also deposited on that date in the account; (3) CVI wired both the payment it had received from CV and the proceeds of the maturing time deposits to CV, transferring a total of $38,747,408.51.

The receipt by CVI of the proceeds of its maturing time deposits was recorded in its general ledger by entries recorded and approved between January 20, 1983, and January 25, 1983.  The repayment by CV of CVI's demand loans and the subsequent transfer of funds by CVI to CV described above were recorded in CVI's general ledger by entries prepared and approved on January 31, 1983.  For accounting purposes, the transfers between CV and CVI were recorded as passing through an account designated

"intercompany account".

On January 31, 1983, and prior to the application of the above-described payment by CVI to CV, CV held qualified export receivables as described in the master receivables purchase agreement and CVI was indebted to CV (1) pursuant to the export promotion agreement for expenses that previously had been paid by CV but had not yet been reimbursed by CVI and (2) for accrued State taxes that would be paid by CV in the first instance. At the time CVI wired the payment to CV, both CV and CVI intended that CVI would (1) purchase from CV the receivables of CV that were outstanding at the close of business on January 31, 1983, (2) reimburse CV for the aforementioned expenses, (3) pay CV an amount equal to the accrued State taxes, and (4) pay a dividend to CV from a portion of the transferred funds.

All events necessary to determine the total amount of the receivables, expenses, and taxes had taken place by the close of business on that date; however, the information necessary to compute the total amount of the items was not available to CV and CVI's tax and accounting departments on that date. In prior years, CVI regularly had reimbursed CV for export promotion expenses pursuant to the export promotion agreement and for State tax payments. Additionally, CVI's and CV's tax and accounting departments did not have available to them on January 31, 1983, the information necessary to compute the amount of the dividend CVI intended to pay CV. At the time CVI made the foregoing

transfers to CV, neither CVI nor CV intended that any portion of the funds transferred would be repaid to CVI.

By February 23, 1983, CV's and CVI's tax and accounting departments had received the information necessary to compute the outstanding balance of CV's qualified export receivables and the amount of unreimbursed export promotion expenses as of January 31, 1983, and to prepare the documents memorializing the transactions. On or about that date, an agreement entitled "Purchase of Qualified Accounts Receivable Agreement", dated effective as of January 31, 1983, provided for CVI's purchase from CV of qualified export receivables in the aggregate face amount of $24,027,770 at a discount of $1,541,782, resulting in a purchase price of $22,485,988. All of the receivables purchased thereby were qualified export assets within the meaning of section 993(b). The amount CVI owed CV as expense reimbursements under the export promotion agreement was $2,570,631, and the amount of accrued State tax CVI owed CV was $228. A portion of the funds CVI transferred to CV on January 31, 1983, was applied to reimburse CV for the expenses and taxes.

Also on or about February 23, 1983, an "Action of Directors In Lieu of a Meeting" was signed by the directors of CVI in which it was voted as of January 31, 1983, to pay CV a dividend of $13,690,561, the difference between (1) the amount of funds CVI wired to CV on January 31, 1983 (viz, $38,747,408), and (2) the sum of (a) the aggregate purchase price of the receivables

purchased by CVI (viz, $22,485,988), (b) the amount CVI owed CV as expense reimbursements under the export promotion agreement (viz, $2,570,631) and accrued State tax.

The foregoing transactions were recorded in CVI's general ledger by entries that were prepared and approved after January 31, 1983, but prior to the time CV and CVI closed their books in accordance with their usual accounting practice.

With respect to CVI's taxable year ending January 31, 1984, the following series of events occurred pursuant to the plan that had been developed in September 1982.  CVI made demand loans to CV on the following dates in 1983 in the following amounts:

| Date | Amount of Loan |
|------|----------------|
| Mar. 31 | $4,694,145 |
| Aug. 29 | 28,552,907 |
| Oct. 31 | 3,365,590 |

Subsequently, on January 27, 1984, the following occurred: (1) CVI made written demand for payment of both the principal amounts of the foregoing loans (viz, $36,612,642) and accrued interest thereon (viz, $1,797,153), which totaled $38,409,795; (2) CV wired $38,409,795 to CVI in full payment of the principal amounts and interest on the foregoing loans, and the payment was deposited in CVI's account with the First National Bank of Boston; and (3) CVI wired $38,409,795 to CV.

The foregoing transfers were recorded in CVI's general ledger by entries that were prepared and approved on or before February 15, 1984, but before CV and CVI closed their books for

the month of January 1984 in accordance with their usual accounting practice. For accounting purposes, not all of the sums transferred between CV and CVI were recorded as passing through the "intercompany account" because the entries used to record the foregoing transactions were more simplified than those used to record the corresponding transfers that had occurred in January 1983.

On January 27, 1984, and prior to the application of the above-described payment by CVI to CV, CV held qualified export receivables as described in the master receivables purchase agreement and CVI was indebted to CV (1) pursuant to the export promotion agreement for expenses that previously had been paid by CV but had not yet been reimbursed by CVI and (2) for accrued State taxes that would be paid by CV in the first instance. At the time CVI wired the payment to CV, CV and CVI intended that CVI would (1) purchase from CV receivables that were outstanding at the close of business on January 31, 1984, (2) reimburse CV for the aforementioned expenses, (3) pay CV an amount equal to the accrued State taxes, and (4) pay a dividend to CV from a portion of the transferred funds. All events necessary to determine the total amount of the receivables, expenses and taxes as of that date had taken place by the close of business on that date; however, the information necessary to compute the total amount of the items was not available to CV's or CVI's tax and accounting departments by the close of business on January 31,

1984.  Additionally, CVI's and CV's tax and accounting departments did not have available to them on January 31, 1984, the information necessary to compute the amount of the dividend CVI intended to pay CV.  At the time CVI made the foregoing transfers to CV, neither CVI nor CV intended that any portion of the transfers would be repaid to CVI.

By February 15, 1984, CVI's and CV's tax and accounting departments had received the information necessary to compute the outstanding balance of qualified export receivables and the amount of unreimbursed export promotion expenses as of January 31, 1984.  On or about February 15, 1984, an agreement entitled "Purchase of Accounts Receivable Agreement" was executed and dated as of January 31, 1984.  The agreement provided for CVI's purchases from CV of qualified export receivables having an aggregate face amount of $33,517,418 at a discount of $2,151,817, for an aggregate purchase price of $31,365,601.  All of the receivables purchased pursuant to the agreement were qualified export assets within the meaning of section 993(b).

Also on or about February 15, 1984, an "Action of Directors in Lieu of a Meeting" was signed by each of CVI's directors in which it was voted to pay as of January 31, 1984, a dividend of $5 million to CV.  The amount of the dividend is equal to the difference between (1) the amount of funds CVI wired to CV on January 27, 1984, (viz, $38,409,795), and (2) the sum of (a) the aggregate purchase price for the receivables purchased by CVI

(viz, $31,365,601), (b)(i) the amount of expense reimbursements CVI owed CV under the export promotion agreement as of that date, and (ii) accrued State taxes (viz, $228), and (c) an unapplied balance of $228.

The foregoing transactions were recorded in CVI's general ledger by entries that were prepared and approved after January 31, 1984, but prior to the time CVI and CV closed their books for the month of January in accordance with their usual accounting practice.

For the period January 31, 1982, through January 31, 1984, no security agreement was executed with respect to the qualified export receivables sold, nor was any financing statement filed.

### Computation of DISC Commission

For each of CVI's taxable years ending January 31, 1983 and 1984, and December 31, 1984 (taxable years in question), petitioners computed the commission payable to CVI using the 50 percent of combined taxable income method (50 percent of CTI method) provided pursuant to section 994(a)(2), allocating a ratable portion of gross interest expense to qualified export receipts by product line for purposes of the method.

## Stock Warrant Issue

### Background

Prior to May 1983, CV decided that, in order to meet its customers' needs, it required a new, more advanced computer

workstation[4] on which to run its CAD/CAM software.  Its customers desired a computer workstation with an "open system environment" that would enable its user to run software other than CV's.  To CV, the change to such a system was a significant strategic change because CV previously had sold products based only upon its own closed proprietary operating systems.  An additional significant strategic change for CV was the decision to purchase its workstations from a vendor, rather than to manufacture them itself, because manufacturing workstations had been its primary activity up to such time.  Due to its large investment in manufacturing assets, however, CV needed be able to continue manufacturing.  CV sought to establish a long-term relationship with a supplier for the design and manufacture of its new workstation.

Two manufacturers, Apollo Computer, Inc. (Apollo), an established firm in the computer workstation industry, and Sun Microsystems, Inc. (Sun), a smaller competitor, submitted bids to CV for such a workstation in response to a solicitation by CV. In a May 9, 1983, letter to CV, Sun acknowledged that it might not be able to produce workstations in quantities sufficient to meet CV's demands, and indicated that it would be willing to

---

[4]

A computer workstation is a desktop computer utilized by scientists or engineers that performs complex computing tasks using its own computing power rather than that of a central computer shared with other users.  Workstations, however, may be linked together to form a network.

grant CV the right to manufacture the workstations were Sun's capacity insufficient.  Sun also set forth its method of discounting purchases, which was to allow a 36-to 40-percent discount from the list price of a product for purchases of between $10 million and $30 million, and a 40-percent discount for purchases above $30 million.  In a May 11, 1983, letter to CV, Sun made reference to a "maximum Computervision discount" of 45 percent.[5]  Neither letter discussed stock warrants.

Although CV made a preliminary decision to select Apollo as its vendor, CV continued to consider Sun because (1) Sun possessed valuable technology and know-how with respect to UNIX, a nonproprietary, open computer operating system that CV believed was best suited to provide the open system environment desired by its customers, but with which CV did not have experience, and (2) Sun aggressively pursued the business.  CV decided to propose to Sun a technology sharing arrangement under which CV and Sun would jointly develop a workstation using Sun's technology and the UNIX operating system.  Also, in order to both allow CV to manufacture workstations and assure Sun that CV would purchase workstations manufactured by Sun and would not manufacture all the workstations itself, CV decided to propose to Sun a "reverse

---

[5]
    Such discount apparently represented the sum of the maximum quantity discount from list price offered by Sun (viz, 40 percent) and the discount allowed for early payment (viz, 5 percent).

royalty" arrangement under which CV could manufacture workstations but would be discouraged from being its primary manufacturer because the "royalty" paid Sun with respect to the workstations would increase as the number of workstations manufactured by CV increased.

During June 1983, representatives of CV and Sun met to discuss the proposals and to develop the framework for their business relationship.  During the negotiations, CV sought to minimize the price at which it would purchase workstations by maximizing the discount from Sun's list price for Sun's products, and Sun sought to maximize the selling price of the workstations, and sought to minimize the discount from its list price.  CV pressed for a higher discount although it was aware that, in the computer industry, a 45-percent discount was on the high end of normal purchase discounts given by suppliers to original equipment manufacturers (OEM's).  Near the conclusion of the June 1983 meeting, CV and Sun discussed giving CV warrants to purchase Sun stock as means of reducing the cost to CV of the transaction with Sun.

The Preliminary Agreement

The negotiations culminated in an agreement that was signed on or about June 17, 1983 (June 17, 1983, agreement), and that established guidelines for the joint development and manufacture of workstations by CV and Sun.  The June 17, 1983, agreement provided that the relationship between CV and Sun was to

encompass: (1) An exchange of current product technologies; (2) cooperation on future product development; (3) sharing of field support services and facilities; (4) investment participation in Sun by CV; and (5) the basis for use of mutually owned designs and manufacturing implementations. The terms regarding the purchase of workstations themselves were "subject to the terms and conditions of a separate OEM contract to be negotiated between the parties". Consummation of the transactions outlined in the agreement was subject to a number of conditions, including the signing of definitive agreements implementing the basic understanding set forth in the June 17, 1983, agreement.

The June 17, 1983, agreement contemplated that Sun would grant to CV two stock warrants and a convertible debenture (debenture). The first warrant was to be exercisable if, within a 36-month period, CV had transacted $20 million of business with Sun, consisting of purchases of Sun-manufactured products and royalties paid by CV. The second stock warrant (second warrant) was to be exercisable if CV's business with Sun (computed on the same basis) reached a level of $30 million within the same 36-month period.[6] Sun regarded the warrants as an incentive for CV

---

[6] The June 17, 1983, agreement provided in relevant part:

  (E) Investment Participation in Sun by CV

  --Warrants (5 Year)

            (continued...)

to purchase workstations from Sun.  Sun believed that it was unlikely that the parties would have agreed on the June 17, 1983, agreement, or that the transactions outlined therein would have been consummated, without the warrants.

Additionally, concerning a $2.5 million loan made to Sun by CV, the June 17, 1983, agreement provided for the issuance of a 5-year, 8-percent, $1.5 million debenture convertible into 100,000 shares of Sun common stock, and a $1 million nonconvertible note.[7]

---

[6](...continued)

     (a)  On 100,000 shares of common stock at $12.00/share, exercisable after CV has received $20 million of Sun-manufactured product plus royalties paid by CV within 36 months after 1st production CV delivery for revenue.

     (b)  On 100,000 share[s] of common stock at $15.00/share exercisable after CV has received $30 million of Sun-manufactured product plus royalties paid by CV within 36 months of 1st production CV delivery for revenue.

[7]

The June 17, 1983, agreement provided in relevant part:

     --Debenture

     A $1.5 million debenture (5 year 8%) convertible into 100,000 shares of common stock, in conjunction with a $1.0 million loan at 8%, such loan to be repaid quarterly at the rate of 10% of the previous three months invoices to CV until the loan is repaid in full.  (i.e., after $10 million in invoices)

The Definitive Agreements

On or about November 22, 1983, CV and Sun executed the following three agreements (agreements):  A purchase agreement (purchase agreement), pursuant to which Sun agreed, inter alia, to sell CV certain workstations on certain terms and conditions and CV agreed, inter alia, to abide by the terms and conditions in the event it purchased any workstations from Sun; an Agreement Relating to Investments by Computervision Corporation in Sun Microsystems, Inc. (investment agreement), which related, inter alia, to the warrants and the debenture to be issued by Sun to CV; and a joint development agreement (joint development agreement), which related, inter alia, to the joint development of certain computer products and provided for the $1 million loan referred to in the June 17, 1983, agreement.  The division of the respective undertakings of CV and Sun into separate agreements had no particular significance, and the parties viewed the agreements as a single integrated agreement.

Pursuant to the terms of the purchase agreement, as set forth in the exhibit entitled "Volume Pricing Terms", CV was allowed an "across the board" discount of 40 percent on all purchase orders for the first 6 months, and after that, a maximum volume discount of 40 percent off list price.  The purchase agreement, which ran for a period of approximately 3 years, contained no reference to the warrants.  It also provided the

"The Joint Development Agreement shall prevail over this Agreement."  The purchase agreement also stated that

> [CV] shall get the benefit of lower prices that are given to other customers of * * * [Sun] for current and future products that are sold on terms and conditions that are the same as the terms and conditions offered to * * * [CV].  If * * * [Sun] does not offer * * * [CV] a price equal to the lowest price being offered to such other customer of * * * [Sun] because the terms and conditions being offered to that customer are different from those offered to * * * [CV], * * * [CV] shall have the option to accept the lower price on the same terms and conditions as are being offered to the other customer.  Terms and conditions shall include, but not be limited to, such items as payment terms, manufacturing rights, quantities, technology exchanges, warranties and up-front investment by a purchaser.

Pursuant to the investment agreement, Sun agreed to issue two stock warrants to CV to provide a further "incentive for an ongoing business relationship."  The exercise of the first stock warrant was contingent upon CV's purchase of $20 million of products (including royalties paid by CV to Sun pursuant to the joint development agreement) within 36 months of the first shipment by Sun to CV; the exercise of the second warrant required $30 million of purchases within the same 36-month period.  The stock warrants were exercisable in whole or in part at any time within 5 years after they first became exercisable.

The investment agreement provided in relevant part:

> Sun and CV have entered into a Joint Development Agreement of even date * * * providing for the sharing by the parties of certain technologies, for the manufacture by CV of certain reasonable workstation

configurations ("RWCs") and for the purchase by CV from Sun of RWCs. In recognition of their mutual expectation of a continuing business relationship of value to both parties, CV has indicated its willingness to make certain loans to Sun and Sun has indicated its willingness to grant to CV an equity participation in Sun.

\*      \*      \*      \*      \*      \*      \*

3.    <u>The Warrants</u>.  As additional incentive for an ongoing business relationship, Sun is issuing to CV (a) a warrant to purchase 10,000 shares of Sun's Series F Preferred Stock at a price of $120.00 per share, such warrant to become exercisable on the day after the Cumulative Sun Business with CV (referred to below) exceeds $20 million if such figure is reached within 36 months of the date of the first shipment by CV of a First Generation RWC (as defined in the Joint Development Agreement) for revenue and (b) a warrant to purchase 10,000 shares of Sun's Series G Preferred Stock at a price of $150.00 per share, such warrant to become exercisable on the day after the Cumulative Sun Business with CV exceeds $30 million if such figure is reached within the 36 month period mentioned in (a) above. \* \* \* Definitions of "Cumulative Sun Business with CV" and of the first shipment by CV of a unit for revenue appear below.

4.    <u>Cumulative Sun Business with CV</u>.  The Cumulative Sun Business with CV, which determines the exercisability of the Warrants as provided above, shall be the aggregate cumulative sum of (i) the amount of Sun's invoices (net of freight, insurance, duty, taxes and returned products) to CV for Sun products purchased by CV under the Purchase Agreement (as defined below), and (ii) royalties payable by CV to Sun pursuant to Section 5 of the Joint Development Agreement.

\*      \*      \*      \*      \*      \*      \*

(b)  The shipment by CV of a First Generation RWC for revenue refers to the first bona fide regular way placement of such a unit by CV with an independent customer, whether such unit be placed on sale or lease terms.  The use by CV of units internally, including units used by its subsidiaries, shall not be regarded

as shipments for revenue.  CV will give Sun written notice of the date of the first shipment of such First Generation RWC for revenue within 30 days after such shipment.

                *       *       *       *       *       *       *

ANNEX II

10,000 Shares Series F/G Preferred Stock

                *       *       *       *       *       *       *

Preferred Stock Purchase Warrant

SUN MICROSYSTEMS, INC. ("Sun"), a California corporation, hereby certifies that, for value received, COMPUTERVISION CORPORATION ("CV"), or permitted assigns, is entitled, subject to the terms set forth below, to purchase from Sun at any time or from time to time after the Initial Exercise Date and before * * * the Expiration Date, 10,000 fully paid and nonassessable shares of Series F/G Preferred Stock of Sun, at the purchase price per share of [$120/150] * * *  The number and character of such shares of Preferred Stock and the purchase price per share are subject to adjustment as provided herein.

This Warrant is one of the Preferred Stock Purchase Warrants (the "Warrants") issued in connection with an Agreement Relating to Investments by Computervision Corporation in Sun Microsystems, Inc. dated November 21, 1983, (the "Investment Agreement").  The Warrants evidence rights to purchase an aggregate of 10,000 shares of Series F Preferred Stock and 10,000 shares of Series G Preferred Stock of Sun * * *

CV had not invested in a supplier prior to the transaction with Sun described above.  CV did not make a practice of investing in its suppliers and did not view the warrants as an investment in Sun.

The linking of CV's ability to exercise the warrants to the dollar volume of business CV transacted with Sun served as an

incentive for CV to do business with Sun. The warrants served as an incentive to CV to purchase workstations manufactured by Sun, rather than to manufacture the workstations itself, during the initial phase of the transaction between CV and Sun. For workstations manufactured by Sun, the purchase agreement provided a higher price to be paid by CV to Sun than the royalties that CV was obligated to pay Sun for workstations manufactured by CV. Consequently, the volume purchase levels at which the warrants became exercisable would be reached more quickly were CV to purchase workstations manufactured by Sun than would be the case if CV were to manufacture them itself and pay royalties to Sun.

The dollar volume of business at which the warrants became exercisable was within the expected dollar volume of business to be transacted between CV and Sun. Although CV did not commit to buying the volume specified in the investment agreement for exercisability of the warrants, its projections furnished to Sun indicated that CV believed it would be able to effect purchases at those volume levels.

The joint development agreement contained provisions implementing the objectives of CV and Sun with respect to the development of future products. As noted above, Sun possessed valuable technology and know-how with respect to the operation of UNIX, an open computer operating system compatible with hardware and software developed by companies besides CV and with which CV

did not have experience. CV intended to develop software for future products, and it was necessary for CV to coordinate such advancement with the development of the workstations by Sun. Further, the parties had to develop an appropriate interface between the systems in order to facilitate the use of Sun's workstations with CV's existing product line. They also agreed to contribute mutually to the design of new workstation products. The parties agreed to broadly share all current product information and knowledge relating to development of future products and to exchange specific items such as hardware and software. The joint development agreement also specified the royalties to be paid by CV for Sun's technology. It also gave CV the right to manufacture workstations if Sun did not supply them under the purchase agreement. Finally, although there was no commitment to purchase any minimum volume of workstations, CV agreed to purchase 50 percent of its workstation requirement from Sun during the 3-year term of the purchase agreement. The joint development agreement also stated that

> 9. <u>CV Investment in Sun</u>. The parties are entering into a separate Agreement Relating to Investments by * * * [CV] in Sun Microsystems, Inc. which provides for loans by CV to Sun and investments by CV in Sun.

<u>The Warrants and the Debt Financing</u>

Both at the time of the negotiations and when the agreements were entered into, neither CV nor Sun knew the extent, if any, to

which the stock warrants would appreciate in value, although CV hoped that Sun would be successful and believed that Sun had the potential to be successful. Sun obtained an independent appraisal of the fair market value, as of November 21, 1983, of the stock warrants. The appraisal estimated the fair market value of the warrant to purchase series F preferred stock to be $146,000 and the fair market value of the warrant to purchase series G preferred stock to be $58,000. The appraisal was made by the investment banking firms of Robertson, Colman & Stephens and Alex, Brown & Sons, Inc. and is set forth in a letter dated March 28, 1984. CV did not acquire Sun stock pursuant to the warrants, but instead ultimately sold the warrants in 1986 and 1987 to underwriters.

During its 1984 fiscal year, Sun had an unsecured working line of credit pursuant to which it could borrow up to $8 million at a rate of interest equal to prime plus .75 percent. Sun also had a $3 million loan commitment from banks that provided for interest equal to the prime rate plus 1 percent. The prime rate in May and June 1983 was 10.5 percent, and, on December 2, 1983, it was 11 percent.

During its negotiations with CV, Sun tried to obtain $5 million of financing from CV. CV, which had a large cash reserve, would only agree to loan $2.5 million to Sun; the financing consisted of the $1.5 million debenture that was

convertible and was subordinated to the extent and in the manner
set forth therein to "all Sun's Senior Indebtedness" (as defined
therein), and a $1 million note.  The form of the debenture
attached to the Investment Agreement as Annex I defined "Senior
Indebtedness" as:

> the principal of (and premium, if any) and unpaid
> interest on, (i) indebtedness of Sun, whether
> outstanding on the date hereof or hereafter created, to
> banks, leasing companies, insurance companies or other
> lending institutions, regularly engaged in the business
> of lending money, which is for money borrowed by Sun or
> a subsidiary of Sun, whether or not secured, or
> equipment leased by Sun or a subsidiary of Sun and (ii)
> any deferrals, renewals or extensions of any such
> indebtedness.

The debenture was also not entitled to a sinking fund.  The
terms of the debenture, issued on December 1, 1983, required Sun
to pay $1.5 million to CV on or before December 1, 1988, with
interest accruing on the unpaid balance at the rate of 8 percent
per year.  The principal amount of the debenture was convertible
into Sun's series G preferred stock at a price equal to $150 per
share.  CV acquired common stock in Sun in conversion of the
debenture and recognized gain on the sale of that stock in 1986
and 1987.[8]

Sale of the Warrants

On March 4, 1986, Sun made its initial public offering of
its common stock.  Subsequently, pursuant to the agreements, each

---

[8]

It appears that the preferred stock that CV was entitled to
receive pursuant to the debenture was converted into common
stock, as was the case with the stock CV became entitled to
receive pursuant to the warrants as discussed below.

share of the Sun preferred stock covered by the stock warrants issued to CV was converted into 15 shares of Sun common stock. Consequently, for each of the two stock warrants, CV had the contingent right to purchase 150,000 shares of Sun common stock.

The first warrant to purchase Sun common stock (at a price of $8 per share, derived by dividing the original exercise price of $120 per share of series F preferred stock by 15, corresponding to the 15-to-1 conversion ratio referred to above) became exercisable in the fourth quarter of Sun's 1986 fiscal year (i.e., April through June 1986) and was exercised on November 24, 1986. On that date, CV sold its rights to the first warrant to an underwriter, who then exercised the first warrant. The closing sale price of Sun common stock as reported in the NASDAQ National Market System on November 24, 1986, was $19.375 per share, or $11.375 per share greater than the $8-per-share exercise price.

During January 1987, the second warrant became exercisable by CV (at a price of $10 per share, derived by dividing the original exercise price of $150 per share of series F preferred stock by 15, corresponding to the 15-to-1 conversion ratio referred to above). CV sold its rights to the second warrant (the "second warrant") to an underwriter on March 12, 1987. The closing sale price of Sun common stock as reported in the NASDAQ National Market System on March 11, 1987, was $31.375 per share, $21.375 greater than CV's $10-per-share exercise price. CV received a net amount of $3,002,750 in proceeds from sale of the

second warrant, after taking into account underwriting costs and other expenses of the sale.

Tax Return and Financial Reporting Treatment of the Sale of the Warrants

On its Federal income tax return for its 1987 taxable year, CV reported part of the gain on disposition of the second warrant as a reduction in its cost of goods sold and part as a long-term capital gain. CV computed a capital gain from the sale of the second warrant of $1,179,578 by subtracting from the $3,002,750 net sale proceeds an "adjusted basis" of $1,823,172. The "adjusted basis" represented the amount that CV would have realized had it disposed of the second warrant when the warrant first became exercisable and which CV treated in its tax return as a reduction in CV's cost of goods sold (i.e., as a discount in the price paid by CV for goods purchased from Sun).

On its Form 10-Q for the quarter ended March 31, 1987, filed with the Securities and Exchange Commission (SEC), CV reported a $4.7 million gain

> from the sale of stock and warrants that had been received in conjunction with a convertible loan and a volume purchase agreement. The portion of the gain attributable to the volume purchase rebate ($1.4 million) was accounted for as a favorable purchase price variance and included in the cost of goods sold. The remaining $3.3 million gain on the sale of stock and warrants has been reflected in other income (net).

On its Form 10-Q for the quarter ended June 30, 1987, filed with the SEC, CV also reported that it had received during the first quarter of the year gain from the sale of common stock and warrants that had been received in conjunction with a convertible

loan and volume purchase agreement.  The Form 10-Q reported that the portion of the gain attributable to the volume purchase agreement ($1.4 million) had been accounted for as a favorable purchase price variance and included in cost of goods sold.

OPINION

DISC Qualification Issue

The first issue that we address is whether CVI qualifies as a DISC pursuant to section 992(a)(1)[9] for each of its relevant taxable years.

In Computervision Corp. v. Commissioner, 96 T.C. 652, 656 (1991), we stated:

In general, a corporation that qualifies as a DISC

---

[9]

Sec. 992(a)(1) provides as follows:

DISC.--For purposes of this title, the term "DISC" means, with respect to any taxable year, a corporation which is incorporated under the laws of any State and satisfies the following conditions for the taxable year:

(A) 95 percent or more of the gross receipts (as defined in section 993(f)) of such corporation consist of qualified export receipts (as defined in section 993(a)),

(B) the adjusted basis of the qualified export assets (as defined in section 993(b)) of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year,

(C) such corporation does not have more than one class of stock and the par or stated value of its outstanding stock is at least $2,500 on each day of the taxable year, and

(D) the corporation has made an election pursuant to subsection (b) to be treated as a DISC and such election is in effect for the taxable year.

is not taxable on its profits.  * * *  Instead, the DISC's shareholder is taxed each year on a specified portion of the DISC's earnings and profits as deemed distributions, while the remaining portion of profits is not taxed until actually withdrawn from the DISC or until the erstwhile DISC ceases to qualify as a DISC. * * *

To ensure that a DISC's tax-deferred profits are used for export activities, Congress provided strict requirements for qualification as a DISC.  * * *

*    *    *    *    *    *    *

Because of minimal capitalization and organizational requirements, a DISC may be no more than a corporation that serves primarily as a bookkeeping device to measure the amount of export earnings that are subject to tax deferral.  [Citation omitted.]

In that case, we concluded that CVI was organized and operated solely as an accounting device for computing income subject to deferral under the DISC provisions.  Id. at 670. Based on the record in the instant case, we similarly conclude that CVI was merely an accounting device to defer taxation of income during the taxable years in issue by qualifying as a DISC.

The parties agree that the only question in dispute concerning CVI's qualification as a DISC for its relevant taxable years is whether the adjusted basis of CVI's qualified export assets exceeded 95 percent of all of its assets at the close of those taxable years (95 percent of assets test).  Sec. 992(a)(1)(B).  The parties further agree that resolution of that question depends solely upon whether CVI's transfers of funds to CV prior to the close of each of those years were effective to complete (1) the purchase from CV of qualified export receivables, (2) the reimbursement of CV for certain expenses,

and (3) the payment of a dividend to CV prior to the close of those taxable years.  The parties agree that, in the event the transfers were effective to complete the foregoing, CVI satisfied the 95 percent of assets test as of the close of each of its relevant taxable years.

Petitioners contend that the transfers in issue effected the purchase of qualified export receivables and the transfer of ownership of the cash used to reimburse CV for certain expenses and to pay dividends to CV, so that CVI's assets as of the close of its relevant taxable years did not include the funds transferred to CV but did include the receivables purchased with a portion of the funds.  Petitioners further contend that the actions taken subsequent to the end of each of CVI's relevant taxable years, when the information necessary to ascertain the amount of receivables purchased became available, merely memorialized or documented the transactions that had taken place before the end of each year.

Respondent, however, contends that the actions taken before the close of each of CVI's relevant taxable years were not sufficient to effect the purchase of CV's qualified export receivables, the reimbursement of expenses incurred by CV, and payment of dividends to CV, but that CV and CVI merely had an intention to do such things at the close of each of CVI's relevant taxable years which was not carried out until after the close of each of those years, when the final steps of each transaction were carried out.  Consequently, respondent maintains

that CVI's assets as of the close of each year included an open account of, or loan to, CV, equal to the amount of funds transferred, which was not a qualified export asset of CVI and that, therefore, CVI failed to satisfy the 95 percent of assets test as of the close of each of its relevant taxable years.

We consider whether, for purposes of the 95 percent of assets test for each of CVI's relevant taxable years, CVI's assets included qualified accounts receivable purchased from CV or an open account equal to the amount of funds transferred from CVI to CV on each of January 31, 1983, and January 27, 1984. Resolution of that question depends upon whether a completed sale of the receivables occurred prior to the close of each of CVI's relevant taxable years.

Petitioners contend that so-called "relaxed ownership requirements" with respect to the acquisition by a DISC of an interest in its parent's accounts receivable, such as were announced by the Commissioner in Rev. Rul. 75-430, 1975-2 C.B. 313, means that arrangements less formal than may be customary are sufficient to effect the purchase of receivables for purposes of the 95 percent of assets test. We, however, do not find the ruling on point because it concerns only the question of whether a DISC's interest in receivables is sufficient for the receivables to be considered qualified export assets of the DISC for purposes of the 95 percent of assets test; it does not address the time at which a transfer of ownership occurs.

In Derr v. Commissioner, 77 T.C. 708, 723-724 (1981), we set

forth the following approach to resolve the issue of when a sale is complete:

> For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under State law. The question of when a sale is complete for Federal tax purposes is essentially one of fact. The applicable test is a practical one which considers all the facts and circumstances, with no single factor controlling the outcome. [Citations omitted.]

See also J.B.N. Tel. Co., Inc. v. United States, 638 F.2d 227, 232 (10th Cir. 1981); Rich Lumber Co. v. United States, 237 F.2d 424, 427 (1st Cir. 1956); Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 318 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994); Yelencsics v. Commissioner, 74 T.C. 1513, 1527 (1980).

Respondent contends that the sale of CV's qualified export receivables could not have occurred prior to the close of CVI's relevant taxable years because the requirements for the transfer of accounts receivable prescribed by Article 9 of the Uniform Commercial Code (U.C.C.) as adopted by Massachusetts were not satisfied. We do not agree. Generally, State law is not dispositive of whether or when a sale or transfer of property occurs for Federal tax purposes. Burnet v. Harmel, 287 U.S. 103, 110 (1932); Snyder v. Commissioner, 66 T.C. 785, 792 (1976). As the Supreme Court has stated:

> the revenue laws are to be construed in the light of their general purpose to establish a nationwide scheme of taxation uniform in its application. Hence their provisions are not to be taken as subject to state control or limitation unless the language or necessary

> implication of the section involved makes its
> application dependent on state law.  * * *  [<u>United
> States v. Peltzer</u>, 312 U.S. 399, 402-403 (1941).]

Respondent does not point to any circumstance showing that Congress intended that a DISC's ability to satisfy the 95 percent of assets test depends solely upon State law governing the passage of title, and we are unable to discern any such intent on the part of Congress.  See also <u>Tumac Lumber Co. v. United States</u>, 625 F. Supp. 1030, 1032 (D. Or. 1985) ("It was not the intention of the U.C.C. drafters that the U.C.C. should apply to transactions such as those" involving the assignment of accounts receivable to a DISC).[10]

Generally, the time of passage of title under State law, while highly significant, is only one factor to be considered in deciding when a sale occurs for Federal tax purposes and is not controlling.  See <u>Morco Corp. v. Commissioner</u>, 300 F.2d 245, 246 (2d Cir. 1962), affg. T.C. Memo. 1961-57; <u>Rich Lumber Co. v. United States</u>, <u>supra</u>.  Where passage of legal title is delayed, an agreement may still result in a sale of property where, looking to all of the facts and circumstances, the parties to the agreement intended the agreement to result in a sale, and the

---

[10]
  We note that, although the Commissioner's rulings are not binding upon this Court, <u>Halliburton Co. v. Commissioner</u>, 100 T.C. 216, 232 (1993), affd. without published opinion 25 F.3d 1043 (5th Cir. 1994), in Rev. Rul. 75-430, 1975-2 C.B. 313, the Commissioner ruled that accounts receivable transferred to a DISC by its parent were "qualified export assets" within the meaning of sec. 993(b)(3) without considering whether the transfer complied with the applicable provisions of State law.

agreement transfers substantially all of the accouterments of ownership. Baird v. Commissioner, 68 T.C. 115, 128 (1977); Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972). In discerning their intent, we rely on the objective evidence of intent furnished by the overt acts of the parties to the agreement. Pacific Coast Music Jobbers, Inc. v. Commissioner, supra; Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).

Other factors considered in addition to the passage of title include, inter alia: (1) How the parties to the agreement treat the transaction; (2) whether the right of possession is vested in the purchaser; (3) which party to the agreement bears the risk of loss with respect to the property; and (4) which party to the agreement receives the profits from the property. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981).

With the foregoing in mind, we consider whether the benefits and burdens of ownership of the qualified export receivables in issue passed to CVI by January 31 of each of its relevant taxable years or at a later time. Although, as noted above, State law (in this case, Massachusetts law) is not controlling as to the time at which the sales of qualified export receivables occurred, we consider Massachusetts law as a factor in our analysis. Respondent, relying on Mass. Ann. Laws ch. 106, sec. 9-102(b)(1) (Law. Co-op 1984), contends that the time a which title passes is governed by the provisions of Massachusetts law embodying

article 9 of the U.C.C., Mass. Ann. Laws ch. 106, secs. 9-101 to 9-507. (Law. Co-op 1984) (article 9). Respondent, relying on Mass Ann. Laws ch. 106, sec. 9-203 (Law. Co-op 1984), contends that a written agreement is required in order to effect a transfer of ownership under that law, and that the sale of the qualified export receivables in issue, therefore, did not occur until each of the written agreements was executed after the close of each of CVI's relevant taxable years. Petitioners posit, and we agree, that compliance with the provisions of article 9 was not necessary to effect a transfer of ownership of the receivables from CV to CVI by the close of CVI's relevant taxable years.

A recent commentary by the Permanent Editorial Board for the U.C.C. addressing this precise question is especially relevant here. We quote below the pertinent language from PEB Commentary No. 14, 3B U.L.A. 89-91 (Supp. 1995):

> It is a fundamental principle of law that an owner of property may transfer ownership to another person. Were a statute intended to take away that right, it would do so explicitly and such a significant curtailment of rights would be supported by substantial reason. No such reason is expressed or implied in * * * [article 9 of the Uniform Commercial] Code or the Official Comments. Indeed, the sale of receivables long antedates adoption of the Code, and it cannot be supposed that either the drafters of the Code or the legislatures that enacted it intended to work so drastic a change in existing law without clearly saying so. Moreover, a close reading of the text of Article 9 and its Comments, particularly in the context of the pre-Code history, compels the conclusion that Article 9 does not prevent transfer of ownership.

> * * * * * * *

CONCLUSION

Article 9's application to sales of receivables does not prevent the transfer of ownership. Official Comment 2 to * * * sec. 9-102 therefore is amended by adding the following paragraph:

Neither Section 9-102 nor any other provision of Article 9 is intended to prevent the transfer of ownership of accounts or chattel paper. The determination of whether a particular transfer of accounts or chattel paper constitutes a sale or a transfer for security purposes (such as in connection with a loan) is not governed by Article 9. Article 9 applies both to sales of accounts or chattel paper and loans secured by accounts on chattel paper primarily to incorporate Article 9's perfection rules. The use of terminology such as "security interest" to include the interest of a buyer of accounts or chattel paper, "secured party" to include a buyer of accounts or chattel paper, "debtor" to include a seller of accounts or chattel paper, and "collateral" to include accounts or chattel paper that have been sold is intended solely as a drafting technique to achieve this end and is not relevant to the sale or secured transaction determination. * * * [Fn. ref. omitted.]

We cannot conclude that the Massachusetts legislature, in enacting article 9, intended to repeal pre-existing law governing transfer of ownership of accounts receivable and to create an exclusive method for effecting such transfers. Under Massachusetts law, an effective assignment of accounts receivable may be made orally, and no particular form of words or of conduct is necessary to constitute such an assignment. Kagan v. Wattendorf & Co., 3 N.E.2d 275, 278 (Mass. 1936). "A valid assignment may be made by any words or acts which fairly indicate an intention to make the assignee the owner of a claim." Id. at 279 (quoting Cosmopolitan Trust Co. v. Leonard Watch Co., 143

N.E. 827, 829 (Mass. 1924)). An assignment may occur prior to the execution of a written agreement, if that is the intent of the parties to the agreement. Id. at 277-279; cf. Rosen v. Garston, 66 N.E.2d 29, 32-33 (Mass. 1946) (time at which title to goods sold passes depends on intent of parties to the agreement). The intent of the parties to the agreement is a question of fact, to be decided from their declarations, conduct, and motive, and all the attending circumstances. Casey v. Gallagher, 96 N.E.2d 709, 712 (Mass. 1951). An enforceable agreement, however, does not arise unless its terms afford a sound basis for (1) determining when a breach of the agreement could occur and (2) affording an appropriate remedy to the party aggrieved in the event of a breach. Louis Stoico, Inc. v. Colonial Dev. Corp., 343 N.E.2d 872, 875 (Mass. 1976); see also 1 Restatement Contracts 2d, sec. 33, comment a (1979).

Consequently, we reject respondent's contention that Mass. Ann. Laws ch. 106, sec. 9-203 (Law. Co-op 1984), requires a written agreement in order to effect a sale of accounts receivable. We, therefore, consider whether, pursuant to general principles of Massachusetts law, ownership of the qualified export receivables in issue passed to CVI prior to the close of its relevant taxable years.

The question we must resolve is whether CV and CVI adequately manifested an intention that ownership of the qualified export receivables in issue pass to CVI by the close of its relevant taxable years and whether a sufficiently definite

agreement for the transfer of the receivables existed at those times.  Although the manner in which CVI and CV effected the sales in issue was not perfect, there are sufficient circumstances in the record to satisfy us that, based on all of the factors discussed above, sales did in fact occur prior to the close of CVI's relevant taxable years.

CV developed a plan in September 1982 to maintain CVI's status as a DISC by transferring the receivables to CVI by the close of CVI's relevant taxable years.  A framework for the purchase of the receivables was furnished by the master receivables purchase agreement.  In pursuance of the September 1982 plan, CVI transferred funds to CV to purchase the receivables prior to the close of its relevant taxable years, and written memorials of the transactions were prepared as soon as the information necessary to compute the amount of receivables purchased became available.  The witnesses at trial credibly testified that the written agreements covering the sales in issue simply memorialized the transactions that had occurred during the relevant taxable years.  CV and CVI documented and accounted for the transactions in a manner consistent with an intent to effect sales by the close of CVI's relevant taxable years.  Old Colony Trust Associates v. Hassett, 150 F.2d 179, 182 (1st Cir. 1945); Baird v. Commissioner, 68 T.C. at 128; Deyoe v. Commissioner, 66 T.C. 904, 911 (1976); Clodfelter v. Commissioner, 48 T.C. 694, 700-701 (1967), affd. 426 F.2d 1391 (9th Cir. 1970).  The record satisfies us that CV and CVI intended the sales of the qualified

export receivables to take effect prior to the close of CVI's relevant taxable years.  We have considered respondent's contentions with respect to the purported defects in the manner in which the sales were effected but conclude that petitioners have nonetheless established that sales of the qualified export receivables occurred prior to the close of the relevant taxable years.

We next consider whether the funds CVI transferred to CV that were used to reimburse CV for export promotion expenses incurred on behalf of CVI pursuant to the export promotion agreement and to pay dividends to CV continued to be assets of CVI after the close of CVI's relevant taxable years.  Respondent contends that the transfers of funds to CV from CVI merely created "open accounts" or receivables of CVI from CV. Petitioners contend that ownership of the funds passed from CVI to CV at the time of their transfer.  The question whether a transfer of property effective for Federal income tax purposes has been made is a question of fact.  Danenberg v. Commissioner, 73 T.C. 370, 390 (1979).  The test for deciding whether a transaction is completed is a practical one, and the transaction must be viewed in its entirety.  Morco Corp. v. Commissioner, 300 F.2d at 246.  In deciding whether a transfer has been completed, we rely upon the objective evidence of intent provided by the overt acts of the parties to the transfer.  Pacific Coast Music Jobbers, Inc. v. Commissioner, 55 T.C. at 874.  Similarly, for Federal tax purposes, the question of whether a debt has been

created as a result of a transfer or distribution depends upon whether, at the time the funds are disbursed, the parties to the transfer at the time of disbursement, intend that they be repaid. Crowley v. Commissioner, 962 F.2d 1077, 1079 (1st Cir. 1992), affg. T.C. Memo. 1990-636; Delta Plastics Corp. v. Commissioner, 54 T.C. 1287, 1291 (1970).

Viewing in its entirety each of the transfers by CVI of funds insofar as the transfer concerned the export promotion expenses incurred by, and the dividends paid to, CV, we conclude that the funds were not assets of CVI as of the close of each of its relevant taxable years.

One factor we consider is whether, pursuant to Massachusetts law, title to the funds transferred by CVI to CV passed to CV by the close of CVI's relevant taxable years. Massachusetts' law provides that possession of property, with the exercise of the rights of ownership, is evidence of title and ordinarily makes a prima facie case of title by the possessor. Hurley v. Noone, 196 N.E.2d 905, 908-909 (Mass. 1964). If, however, evidence is introduced to qualify the evidence of possession, the whole of the evidence is to be considered together to determine the true title. Id. at 909. In the instant case, CV was in possession of, and exercised ownership rights over, all of the cash transferred by CVI by the close of CVI's relevant taxable years, and the evidence of CV's possession has not been qualified by any other evidence in the record indicating that CV was not the owner of the cash. Accordingly, we conclude that, pursuant to

Massachusetts law, title to the cash passed to CV by the close of CVI's relevant taxable years.

The fact that the dividends received by CV were not declared by the directors of CVI until after the close of CVI's relevant taxable years also does not prevent us from concluding that dividends were effectively paid by the close of those years. As a general matter, Massachusetts law provides that no dividend can arise, and shareholders have no right to, or interest in, the accumulated earnings of a corporation, until the authorized representatives of a corporation vote to declare a dividend. Galdi v. Caribbean Sugar Co., 99 N.E.2d 69, 71 (Mass. 1951); Willson v. Laconia Car Co., 176 N.E. 182, 184 (Mass. 1931); Joslin v. Boston & M.R. Co., 175 N.E. 156, 158 (Mass. 1931); Anderson v. Bean, 172 N.E. 647, 652 (Mass. 1930). Although the distribution of dividends by CVI had not been formally authorized by the close of its relevant taxable years, an act performed without authority may be ratified if it could have been authorized at the time it was performed. It has generally been held that ratification of an act relates back to the time at which the act was performed and is equivalent to prior authority for the act, unless the rights of third parties have intervened. Tarrants v. Henderson County Farm Bureau, 380 S.W.2d 274, 277 (Ky. 1964); Phillips v. Colfax Co., 243 P.2d 276, 281 (Or. 1952); Hannigan v. Italo Petroleum Corp. of America, 47 A.2d 169, 171-173 (Del. 1945); see generally 18B Am. Jur. 2d, Corporations, secs. 1635-1660, 1657-1658 (1985); 2A Fletcher Cyclopedia of

Corporations, secs. 750-784 (1992). Consequently, a corporation's board may ratify an unauthorized dividend payment, and, absent intervening rights of third parties, the ratification is retroactive. Meyers v. El Tejon Oil & Refining Co., 174 P.2d 1, 2-3 (Cal. 1946); Milligan v. G.D. Milligan Grocer Co., 233 S.W. 506, 510 (Mo. Ct. App. 1921). In the instant case, no intervening rights of third parties intervened between performance and the subsequent ratification. Although we have found no Massachusetts case directly on point, it appears to us that a corporation could effectively ratify a dividend in Massachusetts under the circumstances of the instant case. See, e.g., Town of Canton v. Bruno, 282 N.E.2d 87, 93 n.8 (Mass. 1972); Shoolman v. Wales Manufacturing Co., 118 N.E.2d 71, 75 (Mass. 1954); Rochford v. Rochford, 74 N.E. 299, 300 (Mass. 1905); McDowell v. Rockwood, 65 N.E. 65, 67 (Mass. 1902). In the instant case, the directors of CVI declared dividends effective as of the last day of each of CVI's relevant taxable years. We consider the declarations of dividends to have effectively ratified the distributions made prior to the close of CVI's relevant taxable years.

As with the receivables, State law is only one factor to consider. Other circumstances surrounding the transfers in issue also indicate that ownership of the funds transferred to CV passed to it by the close of CVI's relevant taxable years. Both CV and CVI intended that, prior to each transfer, CVI would continue to qualify as a DISC and would satisfy the 95 percent of

assets test.  Both CV and CVI intended that, prior to the end of CVI's taxable year, CVI would reimburse CV's export promotion expenses and pay a dividend with the funds that were not required to reimburse the expenses and purchase qualified receivables from CV.  CVI transferred funds to CV's possession prior to the end of each of the taxable years in issue for those purposes.  CV treated those funds as its own, depositing them in its bank account, and each transfer was recorded on the respective books of CV and CVI at that time as a payment by CVI to CV, not as a loan or open account.  There were no circumstances contemplated by the parties under which those funds would be repaid to CVI and there were no further conditions that CV was required to satisfy in order to be entitled to those funds.  Consequently, we conclude that the funds were subject to CV's complete dominion and control at the time they were deposited in its bank account.

Although, by the close of each of CVI's relevant taxable years, all events had occurred to determine the total amount of export promotion expenses owed and qualified accounts receivable to be purchased, that information was not available to CV's and CVI's tax and accounting departments at that time.  That unavailability was the only circumstance preventing the each of CVI's payments to CV from being allocated to and among the expenses reimbursed, the qualified receivables purchased and the dividends paid.  Moreover, under the terms of the export promotion agreement, CV was required to bill the export promotion expenses to CVI at the close of CVI's fiscal year, and the amount

due was payable within 60 days thereafter. Consequently, we conclude that CVI was obligated to reimburse CV for the export promotion expenses at the close of its relevant taxable years. Once the necessary information became available, the appropriate book entries were prepared, effective as of January 31 of each year. The making of the entries effective as of each of those dates, while not conclusive, indicates that the parties intended the transactions in each of those years to take place on each of those dates. Deyoe v. Commissioner, 66 T.C. at 911; Clodfelter v. Commissioner, 48 T.C. at 696, 700-701.

The foregoing circumstances persuade us that CV and CVI intended that the reimbursement of expenses and payment of dividends would occur on January 31 of each of CVI's relevant taxable years and that the transfers did occur on those dates. Consequently, we conclude that the payments of expense reimbursements and dividends occurring prior to the close of CVI's relevant taxable years were effective for the purpose of satisfying section 992(a)(1)(B). Accordingly, we hold that the funds paid to CV by CVI during CVI's relevant taxable years that were used to reimburse export promotion expenses and pay dividends to CV were not assets of CVI as of the close of those years for purposes of the 95 percent of assets test of section 992(a)(1)(B) in each of its taxable years ended January 31, 1983 and 1984, and that CVI qualified as a DISC for each of those

years.[11]

## Computation of DISC Commission

The next issue that we consider is whether, in computing the commission due CVI from CV for CVI's taxable years ending January 31, 1983 and 1984, and December 31, 1984,[12] using the 50 percent of CTI method provided by section 994(a)(2) and (b), CV and CVI are entitled to apportion net, rather than gross, interest expense among their respective product lines.[13]  If net interest expense is apportioned, the combined taxable income (CTI) of CV and CVI will rise, increasing the commission payable to CVI and therefore the amount of income on which tax is deferred under the DISC provisions.

---

[11]

Our holding renders it unnecessary to address respondent's determinations that, in the event CVI does not qualify as a DISC during its relevant taxable years, the commission income CVI received from CV for those years should be reallocated to CV under sec. 482, or, in the alternative, that CVI is taxable on its income for those years.

[12]

We note that CVI's status as a DISC is not in dispute for its taxable year ending Dec. 31, 1984.

[13]

The parties agree that, in the event we hold, as we have, that CVI qualifies as a DISC for its relevant taxable years, that the computation of the amount of commissions payable to CVI for those years and the amount of CV's deduction for those commissions is governed by our decision in Computervision Corp. v. Commissioner, 96 T.C. 652 (1991).  The parties also agree that a reduction of $876,993 is necessary in the adjustment reflecting our holding in Computervision Corp. v. Commissioner, supra, that respondent made in CV's deduction for DISC commissions payable to CVI for CVI's taxable year ending Dec. 31, 1984.  Their agreement is to be taken into account in the Rule 155 computation we order below.

Section 994(a) generally provides methods for computing the transfer price for property sold to a DISC by a related person. Section 994(a) provides that the transfer price is deemed to be set at a level that will allow the DISC to derive taxable income from the sale[14] of property to a DISC by a related person equal to the greatest of, inter alia, 50 percent of the CTI of the DISC and the person from whom it purchased the property attributable to the qualified export receipts from the sale of the property plus 10 percent of the export promotion expenses attributable to the receipts. Sec. 994(a). The methods provided by section 994(a) are also used to compute the maximum amount of income that a DISC acting as a commission agent is permitted to earn in a year. Sec. 1.994-1(d)(2)(i), Income Tax Regs. The 50 percent of CTI method defines CTI generally as the excess of gross receipts from a sale of property over the total costs of the DISC and its related supplier that relate to the sale. Sec. 1.994-1(c)(6), Income Tax Regs. The regulations further provide:

> Costs (other than cost of goods sold) which shall be treated as relating to gross receipts from sales of export property are (a) the expenses, losses, and other

---

[14]

Although the Internal Revenue Code provides that the transfer price computation is to be made on a transaction-by-transaction basis, the regulations promulgated under sec. 994 permit taxpayers to annually elect to group transactions on the basis of products or product lines for purposes of transfer price computation. Sec. 994(a); sec. 1.994-1(c)(7)(i), Income Tax Regs. Petitioners elected to group their export sales transactions by product lines in each taxable year with respect to which the DISC commission issue under consideration has been raised.

> deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses, or other deductions which are not definitely related to a class of gross income, determined in a manner consistent with the rules set forth in * * * [section] 1.861-8, [Income Tax Regs.]. [Sec. 1.994-1(c)(6)(iii), Income Tax Regs.]

Interest is among the expenses subject to apportionment under the rules set forth in section 1.861-8, Income Tax Regs.  Sec. 1.861-8(e)(2), Income Tax Regs.  The regulation apportions interest "based on the approach that money is fungible and that interest expense is attributable to all activities and property regardless of any specific purpose for incurring an obligation on which interest is paid."  Id.  Although the pertinent provisions of section 1.861-8(e)(2), Income Tax Regs., do not specifically provide that the interest expense subject to apportionment is the taxpayer's interest expense net of interest income, rather than gross interest expense, we concluded in Bowater, Inc. v. Commissioner, 101 T.C. 207 (1993), that a taxpayer's net interest expense was the appropriate interest expense to be apportioned. We reasoned that the interest expense net of interest income represents a taxpayer's actual cost of borrowing and noted that interest is assumed to be fungible for purposes of the regulation.  Id. at 211, 214-215.  Accordingly, we held that, for purposes of the 50 percent of CTI method, a taxpayer may apportion a ratable part of net, rather than gross, interest expense to its qualified export receipts in calculating CTI.  Id. at 214-215.

Petitioners contend, and we agree, that CV and CVI are entitled to apply the holding of Bowater, Inc. v. Commissioner, supra, in calculating their CTI. Respondent, contending that Bowater was wrongly decided, urges us to reverse it and hold that gross, rather than net, interest expense must be apportioned in computing CTI. We have considered respondent's arguments, but decline to overrule our prior case. See Coca Cola Co. & Subs. v. Commissioner, 106 T.C. __ (1996). Respondent further argues that a nexus is required between the interest income and expense to be netted. We do not, however, read the cases that have allowed netting of interest income against interest expense for purposes of calculating the interest expense subject to apportionment to require a nexus between the income and expense, although such a nexus often may exist. Nor do we consider such a requirement to be consistent with the approach of section 1.861-8(e)(2), Income Tax Regs., or of Bowater, Inc. v. Commissioner, supra, which both consider interest to be fungible for purposes of apportionment. We, therefore, reject respondent's argument and hold for petitioners on this issue. Coca Cola Co. & Subs. v. Commissioner, supra.

Accordingly, although in their returns with respect to CVI's taxable years in question, petitioners computed the commission payable to CVI under the 50 percent of CTI method using gross interest expense, they are entitled, pursuant to the authority of Bowater, Inc. v. Commissioner, supra, to compute the commission

using net interest expense for those years.

Stock Warrant Issue

The final issue that we consider is the character of the net proceeds from the sale of the second warrant[15] for the purchase of stock in Sun.

Petitioners, contending that the second warrant was a capital asset, argue that the entire amount of the proceeds from the sale of the second warrant constitutes long-term capital gain.

Respondent, contending that the second warrant constituted a discount from the price of workstations purchased from Sun and relying on section 1.471-3(b), Income Tax Regs., argues that the entire amount of the net proceeds from the sale of the second warrant constitutes either an increase in CV's gross income or a reduction in its cost of goods sold.

The transaction in issue is the same one that we considered in Sun Microsystems, Inc. v. Commissioner, T.C. Memo. 1993-467, where we decided the tax treatment of the first and second warrants with respect to their grantor, Sun, except that in the instant case we must decide the tax treatment of the second warrant with respect to its recipient.

We conclude that the approach we took in resolving the issue

---

[15]

We note that only the tax treatment of the second warrant, which CV sold on Mar. 12, 1987, is in issue in the instant case.

in Sun Microsystems, Inc. v. Commissioner, supra, that is, considering all the facts and circumstances of the transaction between Sun and CV, is also appropriate in resolving the issue presented in the instant case.[16]

We note initially that an allowance otherwise constituting a trade discount should not be treated differently for tax purposes simply because it takes the form of property that may ordinarily

---

[16] Petitioners have objected, solely on grounds of relevance, to the admission of certain stipulations and exhibits concerning the transaction between Sun and CV that occasioned CV's acquisition of the second warrant. Petitioners, however, rely on certain of the stipulations and exhibits in their proposed findings of fact, and we deem petitioners to have conceded that those stipulations and exhibits are relevant to the instant case. We consider the remainder of the stipulations and exhibits relevant to the instant case because our decision as to whether the second warrant constitutes a trade discount or a capital asset must be based on all the facts and circumstances concerning the second warrant. Fed. R. Evid. 401. Moreover, even if the stipulations and exhibits do not bear directly on the matters in dispute herein, we find the stipulations to be admissible as background evidence aiding our understanding of those matters, and concerning which we have wide discretion in admitting. United States v. Blackwell, 853 F.2d 86, 88 (2d Cir. 1988); United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988).

Respondent objects to petitioner's offer of respondent's trial memorandum submitted in Sun Microsystems, Inc. v. Commissioner, T.C. Memo. 1993-467, on the grounds that it is irrelevant to the instant case. However, for the same reasons that we admitted the stipulations and exhibits referred to above, we admit the trial memorandum.

Respondent also objects to petitioners' offer of an expert report submitted by respondent in Sun Microsystems, Inc. v. Commissioner, supra, on the grounds that the report is irrelevant, hearsay, and constitutes opinion evidence offered without compliance with Rule 143. We declined to admit the report into evidence in Sun Microsystems, Inc. v. Commissioner, supra, because we found it, inter alia, argumentative and irrelevant, and we decline to admit it in the instant case.

be considered a capital asset. Consequently, our inquiry will focus on whether or not the stock warrant in issue constituted a trade discount given CV by Sun for the purchase of workstations.[17]

Consideration of the facts and circumstances surrounding the transaction between Sun and CV concerning the granting of the second warrant leads us to conclude that the second warrant constituted a trade discount from Sun to CV related to the purchase of workstations. Respondent presented the testimony of James Berrett, who was CV's president at the time of the negotiation of the agreements for the purchase of the workstations and the issuance of the warrants. He testified that, although the warrants were not a significant component of the agreements between CV and Sun, they were an incentive for the

---

[17]
Petitioners contend that respondent abandoned on brief the argument originally advanced in respondent's trial memorandum that the warrants in issue were within the inventory exception to the definition of capital asset, sec. 1221(1), and suggest that respondent is raising a new theory on brief by arguing that the stock warrants constituted a trade discount. We consider respondent's argument on brief, however, to be merely a development of the determination in the notice of deficiency, which was that the net proceeds from the sale of the Sun warrants were taxable "as ordinary income or as a decrease to cost of goods sold." We also disagree with petitioners that respondent has conceded that a portion of the amount realized on the sale of the warrants is taxable as long-term capital gain. Respondent merely stated on brief, that, in the event we decided that the appropriate time for recognition of the trade discount afforded by the warrants was the date on which the warrants were first exercisable, respondent would concede that the excess of the sale price over their value on that date was gain from the sale or exchange of a capital asset.

purchase of workstations from Sun by CV and served to lower the overall cost to CV of the transaction with Sun. Moreover, he testified that CV had never invested in a supplier prior to the transaction with Sun, did not make such investments, and did not regard the warrants as an investment in Sun. Other witnesses testified similarly. CV, in fact, never acquired any Sun stock pursuant to the warrants, but sold the warrants shortly after they first became exercisable to underwriters.

Additionally, the fact that the second warrant was exercisable only upon the transaction of a specified dollar volume of business between CV and Sun, either in the form of purchases of Sun products or payment of royalties by CV, indicates that it was in the nature of a trade discount.[18] Other circumstances connected with the transaction support such characterization. The investment agreement made between Sun and CV described the warrants as "an additional incentive for an ongoing business relationship" between them. The transaction with Sun involved a major strategic shift for CV from manufacturing workstations to purchasing them from a vendor, and the warrants operated as an additional incentive for CV to

---

[18] A trade discount is generally considered a price reduction that is allowed upon the purchase of a specified quantity of merchandise. See Benner Tea Co. v. Iowa State Tax Commn., 109 N.W.2d 39, 43 (Iowa 1961); Argonaut Ins. Co. v. ABC Steel Prod. Co., 582 S.W.2d 883, 887-888 (Tex. Civ. App. 1979); Sperry & Huchinson Co. v. Margetts, 96 A.2d 706, 713 (N.J. Super. Ct. Ch. Div. 1953), affd. 104 A.2d 310 (N.J. 1954).

purchase the workstations from Sun rather than manufacturing them itself, as did the reverse royalty arrangement with Sun. Under the terms of the purchase agreement, CV would reach the dollar volumes of business with Sun at which the second warrant would become exercisable more rapidly if it purchased workstations from Sun rather than manufactured them itself. If Sun became successful by virtue of CV's purchasing workstations manufactured by Sun, Sun's value would be enhanced, and CV could benefit from the increased value through the exercise of the warrants. The warrants CV received from Sun were intended to, and did in fact, lower the cost to CV of purchasing workstations from Sun.[19]

Additionally, in their 1987 income tax return, petitioners treated the net proceeds of the sale of the second warrant as a reduction of cost of goods sold to the extent of the proceeds that would have been realized on the sale of the second warrant had it been disposed of when it first became exercisable

---

[19]

Petitioners, in an effort to bolster their argument that the second warrant was a capital asset of CV, suggest that the warrant represented "partial compensation to Computervision for the below-market interest rate on the loans" CV made to Sun as part of the workstation purchase transaction. If in fact the net proceeds of the sale of the second warrant constituted additional interest income to CV with respect to its loan to Sun, the proceeds would be taxable as ordinary income and not long-term capital gain. See Comtel Corp. v. Commissioner, 376 F.2d 791, 796-797 (2d Cir. 1967), affg. 45 T.C. 294 (1965); Green v. Commissioner, 367 F.2d 823, 825 (7th Cir. 1966), affg. T.C. Memo. 1965-272. Accordingly, accepting petitioners' suggestion would not cause us to adopt petitioners' characterization of the second warrant as a capital asset.

($1,823,172). Petitioners treated the remainder of the net proceeds ($1,179,578) of the sale of the second warrant as long-term capital gain. Moreover, CV described the second warrant in its Forms 10-Q for the quarters ended March 31 and June 30, 1987, as having been received "in conjunction with * * * a volume purchase agreement" and treated a portion the net proceeds of the sale of the warrant as a "volume purchase rebate". Petitioners' treatment of the second warrant for tax and financial reporting purposes indicates that the warrant was in the nature of a trade or volume purchase discount.[20]

Consequently, based on our consideration of all the facts and circumstances in the instant case, we find that the second warrant represented a trade discount received by CV from Sun in the amount respondent determined is includible in petitioners' income; i.e., the net proceeds realized by CV from its sale.[21]

---

[20]

The fact that only a portion of the net sale proceeds was treated as a volume purchase discount merely indicates that CV took the position that the amount of the discount was to be determined at the time that the second warrant first became exercisable and does not affect the admission as to its character. As discussed below, we need not address the appropriate time for measuring the amount of that discount.

[21]

Respondent contends that the full amount of the net proceeds of the sale constitutes a trade discount, but notes that petitioners may argue that the appropriate time for measurement of the amount of discount is the time at which the second warrant first became exercisable, which is the position petitioners took in their return for 1987. Respondent further concedes that, in the event we decide that the appropriate date for recognition of the amount of the discount is the date used in petitioners'

(continued...)

Having decided that the second warrant constituted a trade discount, we next consider how the discount is to be taken into account in computing petitioners' taxable income.  As a general matter for tax purposes, where a trade discount is obtained with respect to goods the cost of which has been included in a taxpayer's cost of goods sold, the discount is treated as an item of gross income.  If, however, the discount relates to goods the cost of which is still in a taxpayer's inventory, the cost of the goods is reduced by the amount of the discount.  See Turtle Wax, Inc. v. Commissioner, 43 T.C. 460, 466 (1965).  The parties have not addressed whether, in the event we decide that the second warrant constitutes a trade discount, the discount should be treated as a reduction in the cost of goods in CV's inventory or as an item of gross income.  In their return for 1987, petitioners treated a portion of the net proceeds of the sale of the second warrant as a reduction of CV's cost of goods sold,

[21](...continued)
return, the treatment of the net sale proceeds in petitioners' return was correct.  Petitioners, on brief, contend that the full amount of the net proceeds of the sale of the second warrant is long-term capital gain and that the appropriate time for recognition is the time at which the second warrant was sold. Petitioners do not attempt to sustain their return position in that regard, and we treat petitioners as not disputing respondent's determination of the appropriate time for recognition of the discount attributable to the second warrant. We note that we have recently ruled that the amount of a seller's deduction for a trade discount attributable to the grant of a stock warrant is to be determined as of the time the warrant is exercised.  Convergent Technologies, Inc. v. Commissioner, T.C. Memo. 1995-320.

rather than as an item of gross income.  Petitioners have not argued that, in the event we decide that the second warrant represented a trade discount, that treatment is incorrect. Respondent also does not dispute that treatment, arguing simply that the net proceeds of the sale of the second warrant constitutes either ordinary income to CV or a reduction in its cost of goods sold.  We, therefore, hold that the entire amount of the net proceeds of sale of the second warrant is a reduction in CV's cost of goods sold.

To reflect concessions and the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.